HUDSON M. JOBE
JOBE LAW PLLC
6060 NORTH CENTRAL EXPRESSWAY,
SUITE 500
DALLAS, TEXAS 75206

ALAN DABDOUB
LYNN PINKER HURST & SCHWEGMANN LLP
2100 ROSS AVENUE, SUITE 2700
DALLAS, TEXAS 75201

SPECIAL COUNSEL TO THE TRUSTEE

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | |
|---|---|
| IN RE:<br><br>MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.,<br><br>*Debtors*.[1] | Chapter 7<br><br>CASE NO. 23-20084-rlj<br><br>Jointly Administered |
| KENT RIES, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATES OF MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>ANGELA ROBINSON, TERRY ROBINSON, REBECCA ROBINSON, 2B FARMS, ARNOLD BRAUN, ARNOLD BRAUN TRUST, ROBERT BRUAN, C HEART RANCH LLC, COLETTE LESH F/K/A COLETTE BROOKS, JAN LESH, GARY LESH, JARED LESH, LESH TRUCKING, JOEL LESH, LAZY J ARENA, MORRISON CAFÉ, GARY LESH TRUST, | ADV. PROC. NO. _____<br><br>Honorable Robert L. Jones |

---

[1] The Debtors in these chapter 7 cases are: McClain Feed Yard, Inc. (Case No. 23-20084-RLJ), McClain Farms, Inc. (Case No. 23-20085-RLJ), and 7M Cattle Feeders, Inc. (Case No. 23-20086-RLJ).

LESH FAMILY TRUST, KATIE LESH,
JORDAN LESH, JARED LESH
COWHORSES, INC., GRAY BROTHERS
CATTLE, GRAY FAMILY TRUST,
RONNIE GRAY, ROBERT GRAY,
BRADLEY GUNGOLL, GUNGOLL
CATTLE LLC, WADE GUNGOLL,
WILLIAM GUNGOLL, WYATT
GUNGOLL, CORY JESKO, JEFF JESKO,
DWIGHT JESKO, PATRICIA JESKO,
DANIEL JESKO, DANIEL JESCO FARMS,
DON JONES TRUCKING, CURT JONES,
KINSEY JONES, CURTIS JONES FARMS,
DON JONES FARM, INC., DON JONES,
JONES FAMILY CATTLE, RIDGEFIELD
CAPITAL, ROBERT ELLIS, ELIZABETH
ELLIS, ROBERT AND ELIZABETH
FAMILY FOUNDATION, TGF RANCH,
THOMAS FRITH, WILDFOREST CATTLE
CO., SAM BROWN, COLBY
VANBUSKIRK, LYNDAL VANBUSKIRK,
JANET VANBUSKIRK, FRANK
VANBUSKIRK, SUSAN VANBUSKIRK,
SAM VANBUSKIRK, CHARLES
LOCKWOOD, NIKKI LOCKWOOD, COLE
LOCKWOOD, SHERLE LOCKWOOD,
PRIEST VICTORY INVESTMENTS,
PRIEST CATTLE, COREY PRIEST,
TYLER PITTMAN, PITTMAN FARMS,
DAC83 LLC, OPEN A ARENA, DOUG
PRITCHETT, 2DEEP CONSTRUCTION
LLC, BRANDON DUFURRENA, RIETA
DUFURRENA, ED DUFURRENA,
SCARLET & BLACK CATTLE, LLC, RED
RAIDER CATTLE, LLC, CARRAWAY
CATTLE LLC, RICHARD CARRAWAY,
ROBERT CARRAWAY, GENE
BROOKSHIRE FAMILY LP, JOEL
BROOKSHIRE, CARLA BROOKSHIRE,
PHILIP RAPP, RAPP RANCH, BIG SEVEN
CAPITAL PARTNERS, BRYAN
BLACKMAN, BRAVO GOLF AVIATION
LLC, DENNIS BUSS, EDWIN BUSS,
BETTYE BUTLER, BILLY BUTLER,
CALEB LITTLE, DANNIE WINFREY,
DIAMOND B PRODUCTIONS LLC, ERIC

| | |
|---|---|
| DEJARNATT, EDWIN STEWART, ERNEST GARD, GALE FORCE QUARTER HORSES, GARWOOD CATTLE COMPANY, J&S INVESTMENTS, JIM RININGER, JIMMY GREER, PEGGY GREER, JOE BURNETT, DUSTIN JOHNSON, KEITH HARRIS FARMS, MAP ENTERPRISES, MICHAEL COOPER, PATRICK BAKER, RALPH REISZ, VERONICA REISZ, ROBERT STEWART, ROGER WELCH, ROSE VALLEY RANCH, SAWMILL CREEK LLC, SCOTT STEWART, SCOTT LIVESTOCK, STANLEY KEITH MYERS, TOMMY MANION RANCH, INC., BRENT BURNETT, CODIE PERRY, MYKEL TIDWELL, RICK RODGERS, STANLEY AYERS, THORLAKSON DIAMOND T FEEDERS, WILEY ROBY RUSSELL JR., WJ PERFORMANCE HORSES, HEARTLAND COOP, LAND O LAKES AG SERVICE, REINERT HAY CO., VET INDUSTRIES FEED & SUPPLY, WHITE ENERGY, CRYSTAL MCCLAIN, CHELSEA MCCLAIN, PIPER MCCLAIN, AND KRISTIN MCCLAIN, | |
| _Defendants._ | |

## TRUSTEE'S  ORIGINAL COMPLAINT FOR
## (1) AVOIDANCE AND RECOVERY OF PREFERENCES AND FRAUDULENT
## TRANSFERS; (2) DISALLOWANCE AND SUBORDINATION
## OF CLAIMS; AND (3) OTHER RELIEF

Kent Ries, the Chapter 7 Trustee of the bankruptcy estates of McClain Feed Yard, Inc.

(Case No. 23-20084-RLJ), McClain Farms, Inc. (Case No. 23-20085-RLJ), and 7M Cattle Feeders,

Inc. (Case No. 23-20086-RLJ) (the "**Trustee**"), files his Original Complaint for: (1) Avoidance

and Recovery of Preferences and Fraudulent Transfers; (2) Disallowance and Subordination of

Claims; and (3) Other Relief with knowledge as to his own acts and otherwise upon information

and belief as follows:

## SUMMARY

1.      A Ponzi scheme is "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." PONZI SCHEME, Black's Law Dictionary (11th ed. 2019); *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011).  In a Ponzi scheme, "a corporation operates and continues to operate at a loss." *Alguire*, 647 F.3d at 597-98 (*quoting Hirsch v. Arthur Andersen & Co*., 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995)).  It gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors. *Id.*  "The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors." *Id.*  As a matter of law, a Ponzi scheme is insolvent from its inception. *Id.*; *Janvey v. Golf Channel, Inc*., 487 S.W.3d 560, 563 (Tex. 2016) ("a Ponzi scheme … is driven further into insolvency with each transaction").  "While Ponzi schemes have been defined in different ways, they are, at bottom, investment scams.  A Ponzi scheme is not a legitimate business, and investment deals are different from debtor-creditor relations." *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2022 WL 2046144 at 7 (Bankr. N.D. Tex. June 3, 2022).

2.      The Debtors operated a massive Ponzi scheme involving purported investments in cattle. The ultimate purpose of this bankruptcy case will be to make the maximum distribution possible to innocent parties that suffered net losses by properly adjusting allowed claims and maximizing the pool of assets that will be available for distribution.

3.      The Trustee may avoid transfers made with the actual intent to hinder, delay, or defraud creditors.  "[T]ransfers made from a Ponzi scheme are presumptively made with intent to

defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky*, 247 F. App'x 583, 586 (5th Cir. 2007); *see also Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006). Because it was a Ponzi scheme, transfers from the Debtors are conclusively presumed to have been made with the requisite fraudulent intent. As the Fifth Circuit opined in the *Brown* appeal:

> TUFTA provides that "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." Thus, "TUFTA requires that the debtor *transferor* make the transfer 'with actual intent to . . . defraud any creditor of the debtor.'" "In this circuit, proving that [a transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." . . . It is well-established that the Stanford principles operated the Stanford entities as a Ponzi scheme, and the existence of the Ponzi scheme establishes fraudulent intent. In other words, this is not the case of an innocent debtor preferring one creditor over another; instead, this was an insolvent Ponzi scheme perpetuated by paying old investors with new investors' investments. We agree with the district court that the Receiver established that the Stanford principles transferred monies to the investor-defendants with fraudulent intent.

767 F.3d at 438-39 (quoting TEX. BUS. & COM. CODE ANN. § 24.005(a)(1); *Alguire*, 647 F.3d at 598) (emphasis in original).[2]

---

[2] The existence of a Ponzi scheme satisfies some key elements for clawback claims commonly brought against transferees. The Bankruptcy Code and Texas Uniform Fraudulent Transfer Act ("TUFTA") both generally permit recovery of transfers made with actual intent to hinder, delay, or defraud creditors. 11 U.S.C. § 548(a)(1)(A); TEX. BUS. & COM. CODE § 24.005(a)(1). Fraudulent intent is established by the existence of a Ponzi scheme. *In re Reagor-Dykes Motors, LP*, 2022 WL 2046144, at *3–4 ("In this circuit, proving that [the transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made") (*quoting Sec. & Exch. Comm'n. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007)). "[T]ransfers from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, 'as a matter of law, insolvent from its inception.' The burden then shifts to the recipient of Ponzi-generated funds to prove an applicable TUFTA defense." *Am. Cancer Soc. v. Cook*, 675 F.3d 524, 527 (5th Cir. 2012).

4.      The Debtors were running a Ponzi scheme and, to keep the scheme going, paid investors and other parties with funds from other investors. The Trustee is, therefore, entitled to disgorgement of the fraudulently transferred funds.

5.      The burden is on the receiving parties to establish an  affirmative defense, if any, of both objective good faith and provision of reasonably equivalent value.   TEX. BUS. & COM. CODE ANN. § 24.009(a); *Hahn v. Love*, 321 S.W.3d 517, 526 (Tex. App. — Houston [1st Dist.] 2009, pet. denied) (citing *Flores v. Robinson Roofing & Constr. Co., Inc.*, 161 S.W.3d 750, 756 (Tex. App. — Fort Worth 2005, pet denied.));; *see also* UNIF. FRAUDULENT TRANSFER ACT § 8 CMT. 1 ("The person who invokes this defense carries the burden of establishing good faith and the reasonable equivalence of the consideration exchanged."); *Scholes*, 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly.").

6.      The Trustee is, therefore, entitled to recover the full amount of transfers unless the recipient proves *both* objective good faith *and* reasonably equivalent value.

7.      With respect to investors,  no reasonably equivalent value was provided for any net winnings. *See Brown*, 767 F.3d 430, *passim*; [Case No. 3:09-CV-0724-N-BG, Doc. 909].

8.      Second, the good-faith element of the affirmative defense requires that the recipient prove objective — not subjective — good faith.  *Byron*, 436 F.3d at 559-560 (good faith is determined under an "objectively knew or should have known" standard); *Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 442 (Bankr. S.D. Tex. 2009) (objective standard is applied to determine good faith); *Quilling v. Stark*, No. 3-05-CV-1976-BD, 2007 WL 415351, at *3 (N.D. Tex. Feb. 7, 2007) ("good faith . . . must be analyzed under an objective,

rather than a subjective, standard.  The relevant inquiry is what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.") (internal citations and quotation marks omitted); *see also Templeton v. O'Cheskey (*In re Am. Hous. Found.*), 785 F.3d 143, 164 (5th Cir. 2015); *GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 301, 312 (5th Cir. 2014); *Horton v. O'Cheskey (In re  Am. Hous. Found.)*, 544 F. App'x 516, 520 (5th Cir. 2013); *Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*, 387 S.W.3d 74, 85-86 (Tex. App. — Houston [14th Dist.] 2012, no pet.); *Hahn*, 321 S.W.3d at 527.

9.       The recipient does not receive a transfer in good faith under § 548 when: (1) the recipient was on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose; and (2) if put on inquiry notice, the transferee failed to engage in a diligent investigation.  *In re Reagor-Dykes Motors, LP*, 2022 WL 2046144 at *11; *see also In re Am. Hous. Found.*, 785 F.3d at 164.  Whether a party was on inquiry notice takes into account "the circumstances specific to the transfer at issue—that is, whether a transferee reasonably should have known ... of the fraudulent intent underlying the transfer."  *In re Am. Hous. Found.*, 785 F.3d at 164.

10.      Transfers to insiders subject the transfers to heavy scrutiny.  *See Hahn*, 321 S.W.3d at 526 n.8 ("[I]nsider status is not limited to the four subjects listed in [TUFTA] section 24.002(7); rather, the list is provided 'for purposes of exemplification.'  In general, an 'insider' is 'an entity whose close relationship with the debtor subjects any transactions made between the debtor and the insider to heavy scrutiny.'  In determining insider status, courts are to consider (1) the closeness of the relationship between the transferee and the debtor and (2) whether the transactions were at arm's length.") (citations omitted); *see also In re*

*Holloway*, 955 F.2d 1008, 1010-11 (5th Cir. 1992); *Bank of Am., N.A. v. Fulcrum Enters, LLC*, 20 F. Supp. 3d 594, 604-05 (S.D. Tex. 2014); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.,* 80 S.W.3d 601, 609 (Tex. App. — Houston [1st Dist.] 2002, no pet.); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25-26 (Tex. App. — Tyler 2000, pet. denied); *J. Michael Putman, M.D.P.A. Money Purchase Pension Plan v. Stephenson*, 805 S.W.2d 16, 18 (Tex. App.— Dallas 1991, no writ).

11.    Transfers made in furtherance of a Ponzi scheme may also be exempt from the ordinary course of business defense that otherwise applies to preference payments under 11 U.S.C. § 547(c)(2)(A) and similar provisions.  *See In re Am. Hous. Found.*, 785 F.3d 143, 160-61 (5th Cir. 2015), as revised (June 8, 2015) (collecting cases).  "The theory underlying the Ponzi exception to the ordinary course of business defense is that Ponzi schemes simply are not legitimate business enterprises which Congress intended to protect with section 547(c)(2)." *Id.* at 161) (internal quotations omitted).

12.    This exception is "narrow" and only applies to a "true Ponzi scheme"—i.e., one where the "operations built on the collection of funds from new investments to pay off prior investors."  *Id.*  The Ponzi scheme exception does not apply when there are merely "some fraudulent or Ponzi-like transactions."  *Id.*; *see also In re Reagor-Dykes Motors, LP*, 2022 WL 2046144, at *5.

13.    In addition to statutory remedies, trustees/receivers can allege common law claims that accomplish the same thing.  For example, a constructive trust is an equitable remedy that may be imposed if the following elements are present: (1) actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing of the property over which the trust is placed to some identifiable *res* in which the plaintiff has an interest.  *Am. Cancer Soc. v. Cook*,

675 F.3d 524, 529–30 (5th Cir. 2012).  Similarly, money had and received is an appropriate

remedy to address unjust enrichment where a defendant holds money that in equity and good

conscience belongs to plaintiff.  *See, e.g., Crawford v. Bleeden*, No. 3:21-CV-2181-X, 2023

WL 2414009, at *6 (N.D. Tex. Mar. 8, 2023); *Taylor v. Trevino*, 569 F. Supp. 3d 414, 436

(N.D. Tex. 2021); *Thomas v. Hopkins*, No. 3:20-CV-576-S (BK), 2021 WL 4268483, at *3

(N.D. Tex. Aug. 26, 2021), *report and recommendation adopted*, No. 3:20-CV-576-S-BK,

2021 WL 4267510 (N.D. Tex. Sept. 20, 2021). Moreover, under TUFTA, the Trustee is entitled

to attorney's fees and costs. See TEX. BUS. & COM. CODE ANN. § 24.013 ("[T]he court

may award costs and reasonable attorney's fees as are equitable and just.").

## JURISDICTION AND VENUE

14.      On April 28, 2023, McClain Feed Yard, Inc. ("**MFY**"), McClain Farms, Inc.

("**MFI**"), and 7M Cattle Feeders, Inc. ("**7M**") (collectively, the "**Debtors**") filed voluntary

petitions for relief under Chapter 7 of the Bankruptcy Code with this Court. The Trustee is the

appointed and acting Chapter 7 Trustee in each of the Debtors' bankruptcy cases.

15.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C.

§§157(a)- (b)  and 1334. This is a core proceeding as defined under 28 U.S.C. § 157(b). Venue is

proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## INVESTOR PARTIES

16.      The following chart identifies the investor parties to this adversary proceeding, the

total payments they received during the 90-day period subject to avoidance as a preference, the

total payments that they received from the Debtors subject to avoidance as a fraudulent transfer,

the corresponding exhibit with the payment detail, and where the parties are believed to reside:[3]

| Robinson Group: Snyder, Texas | | | |
|---|---|---|---|
| **Name** | **Payments Received 1/28/23 - 4/28/23** | **Total Payments Received** | **Exhibit** |
| Angela Robinson | $223,057.46 | $2,397,731.24 | 1 |
| Terry and Rebecca Robinson | n/a | $9,653,108.15 | 2 |
| 2B Farms | $ 104,354,798.76 | $264,945,582.72 | 3 |

| Braun Group: Grandview, Indiana | | | |
|---|---|---|---|
| **Name** | **Payments Received 1/28/23 - 4/28/23** | **Total Payments Received** | **Exhibit** |
| Arnold Braun and Arnold Braun Trust | $1,072,560.07 | $8,140,493.99 | 4 |
| Robert Braun | $701,994.35 | $5,081,724.30 | 5 |

| Lesh Group: Ardmore, Oklahoma; Perry, Oklahoma; Whitesboro, Texas | | | |
|---|---|---|---|
| **Name** | **Payments Received 1/28/23 - 4/28/23** | **Total Payments Received** | **Exhibit** |
| C Heart Ranch LLC | $95,300.00 | $38,739,674.36 | 6 |
| Colette Lesh/ f/k/a Colette Brooks | n/a | $21,811,373.37 | 7 |
| Jan Lesh | $88,382.83 | $15,259,907.31 | 8 |
| Gary Lesh | $88,382.83 | $9,927,438.78 | 9 |
| Jared Lesh | $1,412,994.79 | $8,417,663.84 | 10 |
| Lesh Trucking | $44,661.00 | $565,625.05 | 11 |
| Joel Lesh | n/a | $23,276,411.74 | 12 |
| Lazy J Arena | $19,575.00 | $229,446,486.29 | 13 |
| Morrison Café | n/a | $676,231.54 | 14 |
| Gary Lesh Trust | n/a | $1,837,980.09 | 15 |

[3] With respect to the grouping of parties, it is unclear whether certain parties intended to invest as a group or separately based upon the available records and the Trustee's investigation and analysis thus far. The Trustee reserves the right to amend to separately or collectively allocate transfers between the parties.

| Lesh Family Trust | n/a | $57,655,823.17 | 16 |
|---|---|---|---|
| Katie Lesh | n/a | $21,175.79 | 17 |
| Jordan Lesh | $427,822.47 | $16,657,341.45 | 18 |
| Jared Lesh Cowhorses, Inc. | $510,550.80 | $514,316.30 | 19 |

### Gray Group: Ralston, Oklahoma

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Gray Brothers Cattle, Gray Family Trust, Ronnie Gray, and Robert Gray[4] | $936,349.65 | $7,818,568.86 | 20 |

### Gungoll Group: Stillwater, Oklahoma

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Bradley Gungoll | n/a | $1,269,594.01 | 21 |
| Gungoll Cattle LLC | n/a | $940,764.55 | 22 |
| Wade Gungoll | n/a | $563,025.63 | 23 |
| William Gungoll | n/a | $562,471.56 | 24 |
| Wyatt Gungoll | n/a | $900,142.13 | 25 |

### Jesko Group: Hereford, Texas

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Cory and Jeff Jesko | $91,401.30 | $271,781.55 | 26 |
| Dwight and Patricia Jesko | n/a | $3,669,756.02 | 27 |
| Daniel Jesko and Daniel Jesco Farms | n/a | $506,873.44 | 28 |

### Jones Group: Emporia, Kansas; Reading, Kansas

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Don Jones Trucking | n/a | $2,850,235.94 | 29 |

---

[4] Based upon the investments and payments, the Trustee believes that certain investments by these parties were intended to be joint investments by these parties such that the repayment of those investments was for all of their benefit.

| | | | |
|---|---|---|---|
| Curt and Kinsey Jones and Curtis Jones Farms | n/a | $13,058,806.26 | 30 |
| Don Jones Farm, Inc. | $4,538,985.36 | $49,719,996.73 | 31 |
| Don Jones and Jones Family Cattle | n/a | $15,208,702.23 | 32 |

| Ellis Group: Easton, Maryland; Ridgefield, Connecticut | | | |
|---|---|---|---|
| **Name** | **Payments Received 1/28/23 -4/28/23** | **Total Payments Received** | **Exhibit** |
| Ridgefield Capital | n/a | $17,020,315.29 | 33 |
| Robert Ellis, Elizabeth Ellis and Robert and Elizabeth Family Foundation[5] | n/a | $1,460,210.14 | 34 |

| Frith Group: Hastings, Michigan | | | |
|---|---|---|---|
| **Name** | **Payments Received 1/28/23 -4/28/23** | **Total Payments Received** | **Exhibit** |
| TGF Ranch | $866,486.95 | $9,115,517.93 | 35 |
| Thomas Frith | n/a | $588,473.55 | 36 |

| Wildforest Group: Mayfield, Kentucky | | | |
|---|---|---|---|
| **Name** | **Payments Received 1/28/23 -4/28/23** | **Total Payments Received** | **Exhibit** |
| Wildforest Cattle Co. | $57,028,498.63 | $66,361,991.91 | 37 |
| Sam Brown | n/a | $50,344,455.74 | 38 |

| Vanbuskirk Group: Ringling, Oklahoma | | | |
|---|---|---|---|
| **Name** | **Payments Received 1/28/23 -4/28/23** | **Total Payments Received** | **Exhibit** |
| Colby Vanbuskirk | $1,851,180.61 | $12,810,168.56 | 39 |
| Lyndal Vanbuskirk | $11,087,101.73 | $52,080,407.68 | 40 |
| Janet Vanbuskirk | n/a | $1,711,865.58 | 41 |
| Frank Vanbuskirk | n/a | $3,364,701.11 | 42 |
| Susan Vanbuskirk | $1,851,180.61 | $9,636,573.85 | 43 |

---

[5] Based upon the investments and payments, the Trustee believes that certain investments by these parties were intended to be joint investments by these parties such that the repayment of those investments was for all of their benefit.

| Sam Vanbuskirk | n/a | $516,867.13 | 44 |

### Lockwood Group: Ringling, Oklahoma; Canyon, Texas

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Charles Lockwood | $6,106,054.75 | $44,233,220.48 | 45 |
| Nikki Lockwood | $1,583,335.75 | $8,050,440.32 | 46 |
| Cole Lockwood | $2,344,917.44 | $14,098,621.05 | 47 |
| Sherle Lockwood | $2,339,864.70 | $17,441,698.30 | 48 |

### Priest Group: Lorena, Texas

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Priest Victory Investments | $593,820.85 | $12,463,386.95 | 49 |
| Priest Cattle | $576,548.90 | $37,047,876.24 | 50 |
| Corey Priest | n/a | $1,818,248.38 | 51 |

### Pittman Group: Lacenter, Kentucky

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Tyler Pittman | n/a | $4,982,587.68 | 52 |
| Pittman Farms | n/a | $438,673.02 | 53 |

### Pritchett Group: Canyon, Texas; Amarillo, Texas

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| DAC83 LLC | n/a | $460,945.54 | 54 |
| Open A Arena, Doug Pritchett, and 2Deep Construction LLC[6] | $387,958.03 | $5,533,236.07 | 55 |

### Dufurrena Group: Gainesville, Texas

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Brandon and Rieta Dufurrena | $144,550.16 | $1,528,324.02 | 56 |

---

[6] Based upon the investments and payments, the Trustee believes that certain investments by these parties were intended to be joint investments by these parties such that the repayment of those investments was for all of their benefit.

| Ed Dufurrena | $403,727.24 | $7,937,323.22 | 57 |

**Colton Scott Long Group: Amarillo, Texas**

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Scarlet & Black Cattle, LLC | $2,684,942.99 | $16,635,991.60 | 58 |
| Red Raider Cattle, LLC | n/a | $1,643,120.82 | 59 |

**Carraway Group: Cincinnati, Ohio; Dyersburg, Tennessee**

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Carraway Cattle LLC | $381,157.84 | n/a | 60 |
| Richard Carraway | n/a | $9,316,708.71 | 61 |
| Robert Carraway | n/a | $3,227,300.39 | 62 |

**Brookshire Group: Crosby, Texas**

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Gene Brookshire Family LP | $204,372.38 | n/a | 63 |
| Joel and Carla Brookshire | $180,798.74 | $2,044,984.31 | 64 |

**Rapp Group: Weatherford, Texas**

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit |
|---|---|---|---|
| Philip Rapp | n/a | $261,399.07 | 65 |
| Rapp Ranch | n/a | $5,268,189.85 | 66 |

**Other Investors**

| Name | Payments Received 1/28/23 -4/28/23 | Total Payments Received | Exhibit | Residence |
|---|---|---|---|---|
| Big Seven Capital Partners | $593,433.15 | $1,891,554.95 | 67 | Unknown at this time |
| Bryan Blackman | $1,371,001.26 | $12,741,702.61 | 68 | Healdton, Oklahoma |

| Bravo Golf Aviation LLC | n/a | $529,195.49 | 69 | Crosby, Texas |
|---|---|---|---|---|
| Dennis Buss | $198,443.21 | $ 2,673,703.58 | 70 | Tonkawa, Oklahoma |
| Edwin Buss | $324,102.48 | n/a | 71 | Shawnee, Oklahoma |
| Bettye and Billy Butler | $40,772.67 | $354,637.15 | 72 | Brownsville, Tennessee |
| Caleb Little | n/a | $1,195,131.91 | 73 | Dexter, Kentucky |
| Dannie Winfrey | n/a | $5,828,627.43 | 74 | Mayfield, Kentucky |
| Diamond B Productions LLC | n/a | $964,294.23 | 75 | Healdton, Oklahoma |
| Eric Dejarnatt | $133,675.81 | n/a | 76 | Cunningham, Kentucky |
| Edwin Stewart | n/a | $15,950,523.37 | 77 | Fort Worth, Texas |
| Ernest Gard | n/a | $1,606,891.43 | 78 | Clovis, New Mexico |
| Gale Force Quarter Horses | n/a | $595,679.85 | 79 | Conway, South Carolina |
| Garwood Cattle Company | n/a | $6,457,584.13 | 80 | Columbiana, Ohio |
| J&S Investments | n/a | $ 3,357,451.56 | 81 | Unknown at this time |
| Jim Rininger | $160,528.37 | $3,629,093.33 | 82 | Canyon, Texas |
| Jimmy Greer and Peggy Greer | $3,015,345.74 | $10,910,912.99 | 83 | Murray, Kentucky |
| Joe Burnett | n/a | $249,802.55 | 84 | Unknown at this time |
| Dustin Johnson | n/a | $1,830,225.94 | 85 | McCool, Mississippi |
| Keith Harris Farms | $761,612.72 | $9,396,235.21 | 86 | Benton, Kentucky |
| MAP Enterprises | $133,117,410.22 | $232,187,553.03 | 87 | Mayfiled, Kentucky |
| Michael Cooper | n/a | $54,183.04 | 88 | Unknown at this time |
| Patrick Baker | n/a | $554,870.19 | 89 | Henderson, Kentucky |
| Ralph and Veronica Reisz | $378,543.67 | $7,390,885.14 | 90 | Owensboro, Kentucky |

| Robert Stewart | n/a | $1,389,688.19 | 91 | Unknown at this time |
| Roger Welch | n/a | $1,617,463.58 | 92 | Fairfax, Kentucky |
| Rose Valley Ranch | n/a | $920,502.61 | 93 | Weatherford, Texas |
| Sawmill Creek LLC | n/a | $2,681,548.74 | 94 | Snyder, Texas |
| Scott Stewart | $79,516.53 | $1,035,728.46 | 95 | Memphis, Tennessee |
| Scott Livestock | $2,910,642.06 | $6,103,501.73 | 96 | West Point, Mississippi |
| Stanley Keith Myers | n/a | $2,202,859.09 | 97 | Kevil, Kentucky |
| Tommy Manion Ranch, Inc. | n/a | $1,483,727.56 | 98 | Unknown at this time |
| Brent Burnett | $353,267.61 | n/a | 99 | Melber, Kentucky |
| Codie Perry | $163,249.24 | n/a | 100 | Braman, Oklahoma |
| Mykel Tidwell | $5,039,238.49 | n/a | 101 | Mayfield, Kentucky |
| Rick Rodgers | $142,615.69 | n/a | 102 | Mayfield, Kentucky |
| Stanley Ayers | $305,989.09 | n/a | 103 | Rockford, Ohio |
| Thorlakson Diamond T Feeders | $7,269,755.32 | n/a | 104 | Friona, Texas |
| Wiley Roby Russell Jr. | $1,694,843.58 | n/a | 105 | Brownsville, Tennessee |
| WJ Performance Horses | $794,432.65 | $794,432.65 | 106 | Cleveland, Texas |

17.     In addition to the foregoing transfers detailed in the attached exhibits, the Trustee currently has insufficient information to match the payments detailed on the attached Exhibits 107 and 108 hereto to any particular party.  The Trustee reserves the right to amend to further allocate these payments to any of the investors or vendors.

## **VENDOR PARTIES**

18.     The following are the vendor parties to this adversary proceeding, the total payments they received during the 90-day period subject to avoidance, the goods or services

provided, the corresponding exhibit with the payment detail, and where the parties are believed to reside:

| Name | Payments Received 1/28/23 -4/28/23 | Goods/Services Provided | Exhibit | Residence |
|---|---|---|---|---|
| Heartland Coop | $497,848.72 | Commodities | 109 | Bovina, Texas |
| Land O Lakes Ag Service | $127,530.05 | Commodities | 110 | Arden Hills, Minnesota |
| Reinert Hay Co | $157,853.00 | Commodities | 111 | Hereford, Texas |
| Vet Industries Feed & Supply | $234,702.26 | Commodities | 112 | Friona, Texas |
| White Energy | $292,965.76 | Commodities | 113 | Hereford, Texas |

## FAMILY MEMBER PARTIES

19.     With respect to the individuals named in the Family Member Transactions below, Crystal McClain, Chelsea McClain, Piper McClain, and Kristin McClain are all individuals residing in or around Benton, Kentucky.

## HISTORY OF THE MCCLAIN DEBTORS

20.     Brian McClain was well-known throughout the cattle and rodeo industries and primarily based out of Benton, Kentucky. He formed, owned, and operated each of the Debtors—which he used for various functions in the cattle industry.

21.     The Debtors' primary "legitimate" business was to acquire and aggregate cattle from many different sources throughout Kentucky, the Southeast United States, Texas, and Oklahoma to fulfill large purchase orders for the Debtors' two primary buyers which were located in Texas – Cactus Feeders and Riley/Friona.  With respect to Riley/Friona, during certain periods the Debtors operated as essentially a subcontractor for Riley Livestock, Inc. in acquiring cattle for its fulfillment of large purchase orders for Friona Industries, Inc., and at other times the Debtors

acquired cattle independently from various small sources to fulfill large purchase orders to Riley Livestock, Inc.

22.    To fulfill these large purchase orders to its two Texas customers, the Debtors acquired livestock from a wide variety of sources.  With respect to the livestock acquired around Kentucky and the Southeast, including Florida, the Debtors would transport the cattle to its locations in Kentucky for "straightening out" whereby the cattle would be evaluated for health, size, and other issues, then sorted and kept (where they would be grown and their medical issues would be addressed) until they were transported to the Debtors' Texas facilities or to the Debtors' Texas buyers.  Similarly, with respect to the livestock acquired around Texas and Oklahoma, the Debtors would take possession of the cattle through transporting to and between the Debtors' Texas locations, straighten those cattle out, and then deliver them to the Debtors' two Texas buyers. Generally in each instance, the Debtors would obtain, transport, hold, and eventually deliver cattle to their buyers within 1-3 months of the Debtors' original acquisition.

23.    In addition to the above model, the Debtors also provided feedyard services in a much smaller capacity where in some instances, the Debtors would take possession of third-parties' cattle to feed and grow those cattle.

24.    In connection with these cattle activities, the Debtors had, at any given time, a meaningful amount of cattle on hand. It was with these cattle that McClain and the Debtors attracted investors and ran a much larger Ponzi scheme.

### **OTHER PLAYERS IN THE PONZI SCHEME**

25.    **Rabo AgriFinance LLC ("Rabo")** - in 2017 this lender gave McClain the opportunity to expand his cattle feeding operations from Kentucky into the Texas Panhandle by refinancing a prior secured lending facility. Rabo simultaneously extended massive amounts of

new credit to Debtors through purchase money loans used to acquire new feedyards and funds available on a line of credit. That line of credit was purportedly secured by a so-called lien on all of the "Debtors' cattle." Rabo extended a $12 million line of credit in May 2019, then increased it to $16 million in 2019, and to $23 million in January 2020. Rabo made another $2 million in operating capital available to Debtors in March 2021, bringing Debtors' lines of credit with Rabo to $25 million.

26.    **Community Financial Services Bank ("CFSB") and Mechanics Bank** – these banks handled the Debtors' deposit accounts and allowed the Debtors to perpetuate a massive check-kiting scheme. In that check kiting scheme, the Debtors' Bank would float funds between themselves by floating payments between their accounts at different banks, as well at the same bank using intercompany accounts, to cover NSF payments out to investors.

27.    **Carr, Riggs & Ingram, L.L.C./CRI Advisors, LLC** - an outside CPA/Advisory Firm that provided accounting services to the Debtors and allowed them to, among other things, misrepresent their financial condition.

28.    **Angela Powell and H&R Block** – served as "bookkeeper" to the Debtors and facilitated the flow of inaccurate accounting information.

29.    **HTLF Bank, as Successor to First Bank & Trust ("HTLF")** – the bank of a major investor. HTLF was in possession of pre-signed but otherwise blank checks for the Debtors. HTLF's officers facilitated the faster flow of investor funds by filling out and depositing the Debtors' checks directly.

## THE PONZI SCHEME

30.    Starting by at least 2018, the Debtors procured passive investments from hundreds of parties pursuant to "partnership agreements" where the investor intended to invest money with

the Debtors in return for a purported split of profits from the Debtors' grown cattle.  The investors

were not banks, hedge funds, private equity firms, or large companies. Rather, they were private

individuals and entities that for one reason or another came to know Brian McClain and decided

to invest money with the Debtors to profit in the cattle industry.

31.    Those investors did not: (i) actually take possession of cattle; (ii) visually confirm

the actual existence of "their" cattle; (iii) require or confirm that they were segregated and not the

subject of other investor deals; (iv) obtain unique identifiers on "their" cattle that would enable a

party to confirm any of the foregoing; or (v) actively participate in the management, growth, and

sale of cattle. Instead, the investors' participation in these "cattle" was limited to sending the

Debtors money and waiting for a return on their invested funds.

32.    In many cases, the investor arrangements were based upon a written "partnership"

agreement that varied somewhat in form, but generally contained terms like the following

example:

### Cattle Feeding agreement

This agreement exists to identify the partnership of Brian McClain/McClain Feedyard/7M feeders, 2548 CR 15 Friona Tx. 79035, and Thorlakson Diamond T feeders who are involved in cattle feeding arrangement.  The arrangement allows for Thorlakson Diamond T Feeder LP to purchase the calves from Brian McClain/Mclain Feedyard/7M feeders. At the time of purchase the cattle have also been contracted for sale at a pre-determined price. Brian McClain will grow the cattle to the desired weight and will cover the costs incurred to do so. These costs will include the feed and supplements provided by McClain Feedyard or 7M feeders, as well as all processing, medicine, trucking, and yardage expenses related to the cattle. Once the cattle have reached the desired weight, the profit will be determined as such:

*Sale price of the feeder cattle*

*Minus*

*Cost stated above that McClain incurs.*

*Minus*

*Original cost of the calves returned to Thorlakson Diamond T Feeders LP*

*Equals profit.*

*Profit divided 1/3 McClain and 2/3 Thorlakson Diamond T Feeders LP*

This agreement is for _408_ head of heifer calves at a total weight of _237,292_ lbs. at a price of _163.14_ per pound. They are lots _946_ and located at 7M feeders or McClain feeders. Total cost for this group of calves is $ _390,380.97_ which Thorlakson Diamond T Feeders has paid to McClain Feedyard or 7M feeders.

These feeder cattle are forward contracted to sell at $ _160.00_ per lb. at an average weight of _775_ lbs.

Tom Thorlakson                                      Brian McClain

_(signature)_                                            _(signature)_

Thorlakson Diamond T Feeders LP     McClain Feedyard's/7M Feeders

Date Signed  _Dec 1, 2022_

33.      In other instances, the investor did not have a written "partnership agreement" and instead invested on mere verbal terms similar to the above written agreement.  Those investors sent the Debtors money for cattle already purportedly owned by, and in the possession of, the Debtors under an arrangement that the Debtors would retain the cattle, grow them, and split the

profit with the investor. In many cases, the Debtors suggested to the investor that they had a futures contract for the sale of cattle at a certain price per pound, when in reality, the Debtors did not actually have such guaranteed future price.

34.    In addition to promised profits, the Debtors attracted investors through McClain's participation in the rodeo circuit by providing a "side-benefit" to certain investors by providing "their" cattle to rodeo events where the cattle would be used for roping and similar activities and the Debtors would handle transportation to and from the events.  In reality, there was no record or other way to suggest that the cattle being used for a rodeo was one particular investor's cattle or another. But this ability to use cattle provided by the Debtors at rodeo was an attractive benefit to certain investors in investing in the Debtors' cattle operation.

35.    Some parties may claim for legal positing that the investors did not "invest" but instead "purchased" cattle under these arrangements. The substance of the relationship, however, dictates otherwise. A financial arrangement constitutes an "investment contract" if the contract comprises: (1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).  Here, the parties clearly invested money with the Debtors in a common enterprise that expected profits to be derived solely from the efforts of the Debtors.

36.    Moreover, under applicable law, the investors did not obtain sufficient information of their specific cattle or take possession of cattle in order to even arguably establish a transfer of title and ownership.  *See, e.g.*, UCC §§ 2-501, 2-401, 2-601, 2-105, 2-305, 2-308 (all applicable in both Kentucky and Texas), and Texas Ag. Code 146.001.

37.     In several instances, "investors" even had possession of blank checks from the Debtors that the investors filled in on their own to more quickly facilitate the flow of funds.

38.     In each case, the investor expected an annualized profit of approximately 30% on each transaction based upon specific stated growth rates and future sale weight and price per pound.  The Debtors consistently provided each investor with a return on their investments.

39.     In many cases the investors would receive a full return on their investment. In other cases, investors "pressed" their money with the Debtors by allowing the Debtors to retain some or all of either the principal or profit component of their transaction for future deals.

40.     But the investors' purported "profits" were fictitious. In addition to the unrealistic returns, the volume of cattle that the Debtors should have acquired with the investor money far exceeded: (i) the volume of cattle that the Debtors were capable of handling; (ii) the actual head of cattle that the Debtors were selling to third parties (even assuming that all cattle on hand with the Debtors were acquired with investor funds rather than the Rabo Loan); and (iii) the number of head of cattle ever verified on hand by an independent third party at any time. Accordingly, investors were not repaid with actual profit from actual cattle because that unique cattle backing up every agreement did not actually exist.

41.     Further, based upon the Debtors' bank statements and the sources of funds, it is apparent that when the Debtors repaid investors, they used other investor funds.  Accordingly, the investors' profits were fictitious and reliant upon a stream of new investor funds.

42.     The size of the Ponzi scheme related to the Debtors' actual cattle operations was staggering: the volume of funds in and out of the Debtors' bank accounts for investors exceeded the volume of funds of cattle actually acquired and sold by the Debtors by a 10x multiple.

43.     Moreover, the Debtors resorted to check kiting between 2 different financial institutions to keep the scheme afloat and to cover investor checks when funds on hand were insufficient to cover the investment returns. As further irregular business practices, the Debtors generally accepted all investor money into 1 of the 3 Debtor bank accounts, paid out all investor money out of a different Debtor bank account, and the Debtors' bank statements are mired with intercompany transfers.[7]

44.     The expected "turn" for the acquisition and sale of cattle in the purported business operations of the Debtors was 60-90 days.  In the months leading up to the downfall of the Debtors' scheme, the "turns" between investment and repayment to many investors sped up to a completely unrealistic matter of weeks, and in some instances, days.

45.     The demise of the Debtors' Ponzi scheme occurred when: (i) Rabo performed onsite inspections and confirmed that the reported head of cattle on hand grossly exceeded actual cattle on hand; (ii) Rabo then insisted that the Debtors hire an independent CRO, and (iii) Brian McClain committed suicide on April 18, 2023, within days of the CRO beginning his financial investigation.

## THE WILDFOREST/MAP CLAW BACKS

46.     In the days leading up to Mr. McClain's death, several parties took improper self-help action.  First, Wildforest Cattle and MAP Enterprises worked with CFSB to improperly reverse prior deposits into the Debtors' bank accounts. Exhibit 114 details deposits that were made into the McClain Feed Yard bank account #0197 at Mechanics Bank by MAP Enterprises and Wildforest Cattle. The deposits (all made by check – 47 by MAP / 28 by Wildforest) were made

---

[7] The Debtors' funds were so commingled that the Trustee is taking the position in this lawsuit that the funds should be treated as one single unit for purposes of avoidance claims.  The Trustee reserves the right to amend to further delineate claims against parties based upon payments received or value given with respect to any one particular Debtor.

by "Remote Deposit" on April 3-5, 2023 (Monday through Wednesday). All the checks that were written by MAP & Wildforest were on their individual accounts at CFSB.

47.    Late in the day on Wednesday April 5, 2023, Rabo froze the Debtors' bank accounts and informed Brian McClain on Thursday afternoon April 6 that his Mechanics Bank accounts had been frozen.

48.    It is believed that Brian McClain informed the principals of both MAP and Wildforest of the freezing of the Mechanics Bank accounts, which led to both MAP and Wildforest clawing back the deposits they made on April 3, 4 & 5. Exhibit 114 shows that MAP clawed back approximately $20.4 million in deposits and Wildforest clawed back approximately $10.6 million in deposits, for a total of approximately $31 million.

49.    The MAP & Wildforest clawbacks put the 3 accounts (combined) in a negative position of approximately $31 million.

## CATTLE RECLAMATION/CONVERSION

50.    In the days immediately following Brian McClain's death, the following investors are believed to have taken possession of certain cattle of the Debtors' and/or otherwise had possession of the Debtors' cattle and have attempted to retain the cattle and/or their proceeds:

| Party | Head | Approximate Value |
|---|---|---|
| Bo Robinson | 1055 | $1,055,000.00 |
| Dwight Jesko | 185 | $185,000.00 |
| Colton Long | 290 | $290,000.00 |
| Steve Scott | 23 | $23,000.00 |
| Cory Priest | 540 | $540,000.00 |
| Scott Skinner | 349 | $349,000.00 |
| Ed Dufurrena | 301 | $301,000.00 |
| Keeling Cattle Feeders | 49 | $49,000.00 |
| Thomas Thorlackson | 228 | $228,000.00 |
| Doug Pritchett | 627 | $627,000.00 |
| Phillip Rapp | 75 | $75,000.00 |
| Colette Lesh | 75 | $75,000.00 |
| Tom Frith | 150 | $150,000.00 |

**THE USDA CLAIMS**

51.     The magnitude of the Ponzi scheme is further illustrated by the parties that remained unpaid at the conclusion of the case.  Pursuant to the records provided by the United States Department of Agriculture ("**USDA**"), over 100 claimants filed claims with the USDA under the Dealer Trust Statute (7 U.S.C. § 217(b)) for allegedly unpaid amounts for cattle sales to the Debtors in the total amount of  $122,295,867.46.

52.     Of that total amount, only $2,930,940.33 were considered by the USDA to be "qualified" USDA claims resulting from unpaid sales of cattle to the Debtors.  The remaining $119,364,927.13 of claims all appear to be investor claims described above.  Accordingly, when the Debtors' operations froze, the parties allegedly stiffed on actual cattle purchases comprised a miniscule percentage of the alleged claims of the passive investors.

**CHECK KITING SCHEME**

53.     In addition to the fact that the Debtors' cash activity constituted a Ponzi scheme because the Debtors were repaying investors with fictitious profits, the Debtors' cash activity was also a massive check kiting scheme. Check kiting is described as the process of recording the deposit of an interbank transfer before recording the disbursement, thus briefly double-counting the amount of cash.  In a kiting scheme, multiple bank accounts are opened, often at different bank institutions.  Money is transferred between accounts by the writing of a check out of one account for deposit into another. The period between when credit is given to an account holder by the depositing bank versus when a payment clears from the disbursing bank is referred to as the "float" period. This float period allows the perpetrator to utilize credit for money which did not exist at the time.  In essence, it's the creation of fictitious value of funds.

54.     The Debtors were in an overdraft or overdrawn position with its banks for years.  For example, in late 2019 the Debtors were in an overdraft position by $8,121,103.  In other words,

the Debtors' actual bank balance was negative by this $8,121,103 (not including checks that it had written which had not yet cleared). Such a position created significant exposure for its banks and pressure for the Debtors to raise funds or otherwise correct the overdraft/overdrawn position.

55.    The Debtors' accounts were in an overdraft position a staggering number of days on an annual basis as summarized below:

| Number of Days in Overdraft Position | | | | | |
| --- | --- | --- | --- | --- | --- |
| **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| --- | --- | --- | --- | --- | --- | --- |
| CFSB | 43 | 13 | 6 | 32 | 18 | 1 |
| Mechanics Bank - all accounts | 62 | 54 | 51 | 193 | 87 | 44 |

56.    As seen above, in 2021 the Debtors' accounts with Mechanics Bank were overdrawn 193 days and were overdrawn by milloins of dollars. Normal business accounts are not managed in this fashion.

57.    To remedy the overdrafts, the Debtors resorted to, among other tactics, frequently utilizing a check-kiting scheme. For example, on one example day (July 2, 2020), the Debtors had insufficient funds to cover outstanding checks they had written on their CFSB account. That day, the Debtors wrote $1,295,748.32 in checks from Mechanics Bank account #0197 and deposited them into the Debtors' CFSB account despite not having anywhere close to $1,295,748.32 in deposits with Mechanics Bank. CFSB credited the Debtors' bank account $1,295,748.32 and paid the outstanding checks, which left a positive balance with CFSB that day of only $49,159.78. When the checks finally cleared the Mechanics Bank account the next day (July 3, 2020), along with various other deposits and credits mainly with investor funds, the Mechanics Bank account was overdrawn $776,653. All of this was to create a temporary float for July 2 to allow mostly investor checks to clear on July 2.

58.     Another similar example is on August 21, 2020.  On this day, the Debtors made intercompany deposits from their Mechanics Bank accounts to its CFSB account of $2,800,560.54 to cover what would have otherwise been an approximate $2.78 million shortfall (overdraft) in the CFSB account that day. Like the prior example, the $2,800,560.54 written out of Mechanics Bank account did not clear the Mechanics Bank account until the following Monday, August 24, 2020. In order for the Mechanics Bank account to have sufficient funds to cover the August 21, 2020 $2,800,560.54 deposit made into the Debtors' CFSB account, approximately $2.9 million of investor funds were deposited on August 24, 2020 as follows:

| Date | GROUP CATEGORY | Bank Description | Credit Amount (Deposit |
|------|----------------|-----------------|------------------------|
| 8/24/2020 | WILLIAM A WEDDINGTON | WIRE TRANSFER 1/WILLIAM A WEDDINGTO 02100002141FT03 | $ 269,335.25 |
| 8/24/2020 | SUSAN H FOSTER | WIRE TRANSFER 1/SUSAN H FOSTER    02100002141FT03 | $ 174,639.92 |
| 8/24/2020 | LESH GROUP - LAZY J | REMOTE DEPOSIT | $ 720,426.13 |
| 8/24/2020 | JONES GROUP - DON JONES FARM | REMOTE DEPOSIT | $ 67,764.06 |
| 8/24/2020 | JONES GROUP - DON JONES FARM | DEPOSIT | $ 150,000.00 |
| 8/24/2020 | JONES GROUP - CURTIS JONES FARMS | REMOTE DEPOSIT | $ 81,359.98 |
| 8/24/2020 | JONES GROUP - CURT & KINSEY | REMOTE DEPOSIT | $ 34,218.16 |
| 8/24/2020 | JIMMIE T RININGER SHERRY D RININGER | REMOTE DEPOSIT | $ 149,943.96 |
| 8/24/2020 | BRAUN GROUP - ROBERT BRAUN | REMOTE DEPOSIT | $ 151,440.98 |
| 8/24/2020 | BRAUN GROUP - ROBERT BRAUN | REMOTE DEPOSIT | $ 151,440.98 |
| 8/24/2020 | BRAUN GROUP - ARNOLD & MARTHA | REMOTE DEPOSIT | $ 152,243.25 |
| 8/24/2020 | BRAUN GROUP - ARNOLD & MARTHA | REMOTE DEPOSIT | $ 281,604.23 |
| 8/24/2020 | 2B FARMS GROUP - TERRY / BO ROBINSON | WIRE TRANSFER 2B FARMS        11132106302FT03 | $ 514,296.47 |
| | | | |
| | | | $ 2,898,713.37 |

59.     The Debtors consistently utilized massive extensive intercompany transfer activity between their accounts to create artificial account value, specifically over 5,000 transactions in the hundreds of millions of dollars on an annual basis, as summarized below:

**Intercompany Activity at Community Financial Services Bank – Receipts and Withdrawals:**



**Intercompany Activity at Mechanics Bank – Receipts and Withdrawals:**



60.    Despite the extensive use of check-kiting, the Debtors' accounts remained over-

drawn and materially so, for example:





61.    The Debtors' intercompany transactions totaled in the tens of millions per month and $2 billion in 5 years, thus illustrating the fraudulent volume required to, among other things, fund the check kiting scheme and desperately attempt to cover the checks to investors:

McClain Feed Yard Inc. et al - Intercompany Receipts & Withdrawals

| Sum of Amount | Column Labels | |
|---|---|---|
| Row Labels | 1 - Receipt | 2 - Withdrawal |
| **2018** | **$ 28,799,906.85** | **$ (42,578,079.08)** |
| Mar | | $ (120,606.18) |
| Apr | | $ (1,102,234.18) |
| May | $ 146,573.79 | $ (1,048,273.03) |
| Jun | $ 1,275,971.53 | $ (3,188,532.73) |
| Jul | $ 2,562,453.77 | $ (5,464,406.33) |
| Aug | $ 1,675,873.37 | $ (3,245,090.82) |
| Sep | $ 2,753,048.17 | $ (4,083,191.72) |
| Oct | $ 5,830,610.41 | $ (8,956,661.89) |
| Nov | $ 6,016,724.16 | $ (6,023,534.01) |
| Dec | $ 8,538,651.65 | $ (9,345,548.19) |
| **2019** | **$ 448,755,804.77** | **$ (447,266,806.85)** |
| Jan | $ 11,406,551.72 | $ (10,214,012.52) |
| Feb | $ 9,035,585.37 | $ (9,958,011.42) |
| Mar | $ 13,507,255.16 | $ (13,366,797.87) |
| Apr | $ 9,528,393.61 | $ (9,245,315.75) |
| May | $ 14,190,456.11 | $ (14,884,104.41) |
| Jun | $ 12,067,530.22 | $ (10,475,451.61) |
| Jul | $ 32,560,973.94 | $ (32,020,103.42) |
| Aug | $ 31,788,005.91 | $ (32,253,124.89) |
| Sep | $ 33,039,934.10 | $ (32,664,003.90) |
| Oct | $ 69,584,908.77 | $ (67,146,406.24) |
| Nov | $ 95,485,372.06 | $ (92,906,363.95) |
| Dec | $ 116,560,837.80 | $ (122,133,110.87) |
| **2020** | **$ 173,132,814.32** | **$ (174,078,533.25)** |
| Jan | $ 14,398,853.35 | $ (15,904,950.35) |
| Feb | $ 14,288,131.35 | $ (14,118,523.03) |
| Mar | $ 4,766,643.68 | $ (4,655,972.80) |
| Apr | $ 8,193,392.90 | $ (8,473,672.10) |
| May | $ 11,028,095.69 | $ (9,295,385.58) |
| Jun | $ 7,249,828.82 | $ (8,358,770.56) |
| Jul | $ 13,849,616.14 | $ (13,872,438.72) |
| Aug | $ 18,141,555.45 | $ (17,826,752.34) |
| Sep | $ 8,486,514.39 | $ (9,197,216.08) |
| Oct | $ 18,138,808.75 | $ (18,163,254.64) |
| Nov | $ 18,320,750.78 | $ (18,501,352.10) |
| Dec | $ 36,270,623.02 | $ (35,710,244.95) |
| **2021** | **$ 416,025,913.53** | **$ (417,358,816.84)** |
| Jan | $ 26,537,170.61 | $ (26,348,992.02) |
| Feb | $ 26,685,832.35 | $ (26,754,845.44) |
| Mar | $ 41,131,031.22 | $ (40,472,278.10) |
| Apr | $ 38,548,390.25 | $ (37,372,100.97) |
| May | $ 33,596,805.59 | $ (36,028,391.68) |

**McClain Feed Yard Inc. et al - Intercompany Receipts & Withdrawals**

| Sum of Amount | Column Labels | | |
|---|---|---|---|
| Row Labels | 1 - Receipt | | 2 - Withdrawal |
| Jun | $ | 59,539,625.14 | $ (55,696,330.24) |
| Jul | $ | 54,110,182.17 | $ (53,445,359.37) |
| Aug | $ | 46,069,823.40 | $ (50,443,529.31) |
| Sep | $ | 23,296,228.75 | $ (24,511,755.05) |
| Oct | $ | 24,952,921.47 | $ (23,918,897.87) |
| Nov | $ | 17,222,070.58 | $ (17,079,197.03) |
| Dec | $ | 24,335,832.00 | $ (25,287,139.76) |
| **2022** | **$** | **435,475,256.98** | **$ (433,750,503.55)** |
| Jan | $ | 25,886,808.85 | $ (26,368,590.70) |
| Feb | $ | 25,274,613.19 | $ (24,020,306.10) |
| Mar | $ | 12,120,432.21 | $ (12,095,222.16) |
| Apr | $ | 17,466,813.62 | $ (17,492,023.67) |
| May | $ | 25,845,302.81 | $ (25,845,302.81) |
| Jun | $ | 29,948,402.76 | $ (29,948,402.76) |
| Jul | $ | 28,330,608.91 | $ (28,330,608.91) |
| Aug | $ | 17,636,490.02 | $ (17,636,490.02) |
| Sep | $ | 34,651,502.15 | $ (34,662,976.75) |
| Oct | $ | 30,052,862.40 | $ (30,052,862.40) |
| Nov | $ | 81,358,824.75 | $ (81,358,824.75) |
| Dec | $ | 106,902,595.31 | $ (105,938,892.52) |
| **2023** | **$** | **551,667,798.99** | **$ (552,631,501.74)** |
| Jan | $ | 106,266,784.61 | $ (107,230,487.40) |
| Feb | $ | 189,891,717.00 | $ (189,891,717.00) |
| Mar | $ | 228,932,748.79 | $ (228,932,748.79) |
| Apr | $ | 26,576,548.55 | $ (26,576,548.55) |
| Jun | $ | 0.04 | |
| **Grand Total** | **$** | **2,053,857,495.44** | **$ (2,067,664,241.31)** |

## THE FAMILY MEMBER TRANSACTIONS

62.     Crystal McClain is Brian McClain's ex-wife. Chelsea McClain was the wife of Brian McClain as of his date of death on April 18, 2023. Piper McClain, Kristin McClain, Meagan Goad, and Kinsey Moreland are Brian McClain's daughters.

63.     On September 25, 2020, the Marshall Family Court of the Commonwealth of Kentucky entered its Findings of Fact, Conclusions of Law, and Decree of Dissolution of Marriage

(the "**Divorce Decree**") approving the Marital Settlement Agreement between Brian McClain and

Crystal McClain attached. Pursuant to the Divorce Decree and the Marital Settlement Agreement,

Brian McClain was ordered to pay Crystal McClain $1.7 million as a property division in return

for Brian McClain retaining his interests in the Debtors.  The Debtors in turn paid Crystal McClain

$1,170,000.00 million presumably in connection with the Divorce Decree:

| **Company** | **Bank** | **Acct** | **Date** | **Check** | **Payee** | **(Payment)** |
|---|---|---|---|---|---|---|
| McClain Feed Yard | Mechanics Bank | 0197 | 11/16/20 | 2871 | CRYSTAL MCCLAIN | (70,000.00) |
| McClain Farms | Community Financial Services Bank | 3786 | 01/11/21 | 26708 | CRYSTAL MCCLAIN | (250,000.00) |
| McClain Farms | Community Financial Services Bank | 3786 | 01/21/21 | 26709 | CRYSTAL MCCLAIN | (250,000.00) |
| McClain Farms | Community Financial Services Bank | 3786 | 03/24/21 | 28678 | CRYSTAL MCCLAIN | (250,000.00) |
| McClain Farms | Mechanics Bank | 3070 | 07/06/22 | 2906 | CRYSTAL MCCLAIN | (50,000.00) |
| McClain Farms | Mechanics Bank | 3070 | 07/12/22 | 2908 | CRYSTAL MCCLAIN | (100,000.00) |
| McClain Farms | Mechanics Bank | 3070 | 07/22/22 | 2907 | CRYSTAL MCCLAIN | (100,000.00) |

64.     In addition to these transfers, Brian McClain had eight separate term life insurance

policies with 3 different carriers. He had five policies with Grange/Kansas City Life, two policies

with Cincinnati Life, and one policy with Prudential. The beneficiaries on the first six policies

(five from Grange and one from Cincinnati) were McClain's four daughters (Megan Goad, Kinsey

Moreland, Piper McClain and Kristin McClain), each of whom has received 25% of the life

insurance. The second Cincinnati policy, which was purchased as required by the Divorce Decree

"was a declining annual scale to be paid to his ex-wife, Crystal McClain (in 2021, it was $550,000).

On the last policy (Prudential), beneficiaries were Chelsea McClain at 32%, and each of the four

daughters at 17% each.  The death benefit on these policies is believed to have been $3 million, which resulted in Chelsea McClain receiving $960,000 and each of the daughters receiving $510,000.

65.    It is believed that the benefit under the two policies with Cincinnati Life totaled $4,700,000.00, and the death benefit under the five Grange policies was $7,350,000. The beneficiaries under the Grange policies were as follows (all list the daughters as beneficiaries at 25% each): $3,000,000; $2,000,000; $1,500,000; $750,000; and $100,000.

66.    In total, the following amounts were paid out in 2023 on the life of Brian McClain, with the premiums for those policies being paid for by the Debtors: $550,000.00 to Crystal McClain; $960,000 to Chelsea McClain; and $2,347,500.00 to each of Megan Goad, Kinsey Moreland, Piper McClain and Kristin McClain ($510,000 each on the first Cincinnati Life policy and $1,837,500 each on the five Grange policies).

67.    The premiums from the term life insurance policies for the effective periods for coverage through Mr. McClain's date of death were paid by funds from the Debtors:

**Checks from McClain Farms, Inc. - Mechanics Bank Acct #3070**

| | | | |
|---|---|---|---|
| 1353 | 11/16/21 | 7,062.00 | Cincinnati Life Insurance Co |
| 1151 | 10/20/21 | 2,615.00 | Grange |
| 1351 | 11/16/21 | 5,835.00 | Grange |
| 2134 | 03/08/22 | 8,925.00 | Cincinnati Life Insurance Co |
| 2260 | 03/29/22 | 6,865.00 | Prudential Insurance |
| 2374 | 04/18/22 | 945.00 | Grange |
| 3535 | 10/04/22 | 1,785.00 | Grange |
| 3623 | 10/17/22 | 2,615.00 | Grange |
| 4125 | 12/12/22 | 7,062.00 | Cincinnati Life Insurance Co |
| 4124 | 12/13/22 | 5,835.00 | Grange |
| 7175 | 03/14/23 | 6,865.00 | Prudential Insurance |
| 7179 | 03/17/23 | 8,925.00 | Cincinnati Life Insurance Co |

**Checks from McClain Farms, Inc. - Community Financial Services Bank Acct #3786**

| | | | |
|---|---|---|---|
| 21245 | 06/12/18 | 945.00 | Grange |
| 21734 | 09/28/18 | 4,400.00 | Grange |
| 22153 | 12/03/18 | 5,835.00 | Grange |
| 22953 | 03/27/19 | 8,925.00 | Cincinnati Life Insurance Co |
| 23157 | 04/23/19 | 945.00 | Grange |
| 24362 | 09/30/19 | 2,615.00 | Grange |
| 24365 | 09/30/19 | 1,785.00 | Grange |
| 24675 | 11/06/19 | 5,835.00 | Grange |
| 25911 | 03/19/20 | 8,925.00 | Cincinnati Life Insurance Co |
| 26156 | 04/23/20 | 945.00 | Grange |
| 27464 | 10/14/20 | 2,615.00 | Grange |
| 27467 | 10/14/20 | 1,785.00 | Grange |
| 27730 | 11/12/20 | 5,835.00 | Grange |
| 27927 | 12/11/20 | 7,062.00 | Cincinnati Life Insurance Co |
| Elec | 03/30/21 | 6,865.00 | INS PAYMNT PRUDENTIAL |
| 28689 | 03/30/21 | 8,925.00 | Cincinnati Insurance Co |
| 28825 | 04/20/21 | 945.00 | Grange |
| 29981 | 09/28/21 | 1,785.00 | Grange |

68.    Moreover, to the extent any premiums were ever paid by Brian McClain, the banking records for both the Debtors and Mr. McClain are clear that his only source of personal funds for Mr. McClain was transfers from the Debtors. Given the massive Ponzi scheme at issue in this case, McClain's funds should be considered the property of the Debtors.

## COUNT 1: FRAUDULENT TRANSFER CLAIMS –
## FAMILY MEMBER TRANSACTIONS

69.    The $1,170,000.00 received by Crystal McClain from the Debtors in connection with the Divorce Decree was on account of an obligation not owed by the Debtors. The following parties receiving the following proceeds of term life insurance paid for by funds of the Debtors: Crystal McClain - $550,000.00; Chelsea McClain - $960,000.00; Piper McClain - $2,347,500.00; and Kristin McClain - $2,347,500.00.

70.    The Debtors obviously received less than reasonably equivalent value for the Divorce Decree payment and the life insurance proceeds given that there was no reciprocal

consideration to the Debtors. Further, those funds were paid out during the operation of the Debtors' massive Ponzi scheme.  Accordingly, all such transfers were made with actual intent to hinder, delay, or defraud parties which the Debtors were or became liable after the transfers. The Debtors were decidedly insolvent given the amount of the asserted Rabo debt, other claims of investors, and other debts, against the asset value of the Debtors. The Debtors were further engaging in transactions at each juncture for which they had unreasonably small capital to satisfy (and were instead reliant upon further investor advances) and for which the Debtors knew they could not satisfy when matured without additional investor funds.

71.     Accordingly, all the Debtors' transfers pursuant to the Divorce Decree and for the term life insurance violated 11 U.S.C. §548(a)(1)(A) and (a)(1)(B); Sections 24.005 and .0006 of the Texas Fraudulent Transfer Act; and Sections 378A.040 and .050 of the Kentucky Uniform Voidable Transactions Act.

72.     Accordingly, pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 548(a)(l)(B), 550, and 551, Texas Business and Commerce Code §§ 24.005 and 24.006, and/or Kentucky Uniform Voidable Transactions Act §§ 378A.040 and .050  the Trustee is entitled to judgments:(a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from the parties as follows:

     a.     Crystal McClain in the amount of $1,720,000.00;

     b.     Chelsea McClain in the amount of $960,000.00;

     c.     Piper McClain in the amount of $2,347,500.00; and

     d.     Kristin McClain in the amount of $2,347,500.00.

73.     The Trustee is further entitled to a judgment awarding his attorney's fees. Tex. Bus. & Com. Code Ann. § 24.013.

## COUNT 2: ALTERNATIVE CLAIMS – FAMILY MEMBER TRANSACTIONS

74.    In the alternative, given the circumstances of this case it would be inequitable to allow the parties to retain the subject funds:

e.    Crystal McClain in the amount of $1,720,000.00;

f.    Chelsea McClain in the amount of $960,000.00;

g.    Piper McClain in the amount of $2,347,500.00; and

h.    Kristin McClain in the amount of $2,347,500.00.

75.    In the alternative, the Trustee is entitled to a judgment against the foregoing parties in the foregoing amounts under principles of constructive trust, unjust enrichment, and/or money had and received.

## COUNT 3: PREFERENCE CLAIMS - INVESTORS

76.    Each of the Investor Parties above with corresponding figures in the field "Payments Received 1/28/23 - 4/28/23" ("**Investor Preference Defendants**") received the total payments during the preference period on account of preexisting written or verbal cattle investment agreements with the Debtors, as further detailed on the attached exhibits, which the Trustee reasonably believes have net preferences owing after consideration of their affirmative defenses.

77.    In addition, certain Investor Preference Defendants have taken and/or retained cattle as described above.

78.    Pursuant to 11 U.S.C. § 547(b): [e]xcept as provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

79.    Each payment to the Investor Preference Defendants was a transfer of an interest belonging to the Debtors for the benefit of the Investor Preference Defendant on account of an antecedent debt owed by the Debtors before the transfer was made. Likewise, the reclaimed/retained cattle constitute a transfer of an interest in property of the Debtors on account of a prior debt. The antecedent debt was the prior investment made by the Investor Preference Defendant. At the time of the transfers, the Debtors were decidedly insolvent given the amount of the asserted Rabo debt, other claims of investors, and other debts, against the asset value of the Debtors. The transfers were made within 90 days of the Petition Date.

80.    This case will not be a 100% case.  The Trustee is currently only holding less than $10M of assets against over $150M of asserted debt, other than litigation claims.  The majority of the litigation claims consist of avoidance actions that expose the defendant to a resulting claim under section 502(h) of the Bankruptcy Code.

81.    The Trustee is entitled to avoid the payments and reclaimed/retained cattle pursuant to 11 U.S.C. §§ 547 and 550, and to preserve the value of the payments and the reclaimed/retained cattle for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551.

## COUNT 4: PREFERENCE CLAIMS - VENDORS

82.     Each of the following Vendor Parties are defendants to this lawsuit that have

received the payments during the preference period, as further detailed on the attached exhibits.

83.     Pursuant to 11 U.S.C. § 547(b): [e]xcept as provided in subsections (c) and (i) of

this section, the trustee may, based on reasonable due diligence in the circumstances of the case

and taking into account a party's known or reasonably knowable affirmative defenses under

subsection (c), avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
    (A) on or within 90 days before the date of the filing of the petition; or
    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and
    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

84.     Each payment to the Vendor Parties was a transfer of an interest belonging to the

Debtors for the benefit of the Vendor Parties on account of an antecedent debt owed by the Debtors

before the transfer was made. The antecedent debt was the prior goods or services, as noted,

provided to the Debtors by the Vendor Parties. At the time of the transfer, the Debtors were

decidedly insolvent given the amount of the asserted Rabo debt, other claims of investors, and

other debts, against the asset value of the Debtors. The transfers were made within 90 days of the

Petition Date.

85.    This case will not be a 100% case.  The Trustee is only holding $10M of assets against over $150M of asserted debt, other than litigation claims.  The majority of the litigation claims consist of avoidance actions that expose the defendant to a resulting claim under section 502(h) of the Bankruptcy Code.

86.    The Trustee is entitled to avoid these payments to the Vendor Parties pursuant to 11 U.S.C. §§ 547 and 550, and to preserve the value of the payments for the benefit of the bankruptcy estates pursuant to 11 U.S.C. § 551.

## COUNT 5: FRAUDULENT TRANSFER CLAIMS - INVESTORS

87.    As discussed above, the transfers to the Investor Parties were fictitious returns on fraudulent cattle investments. Accordingly, all transfers were made with actual intent to hinder, delay, or defraud parties which the Debtors were or became liable after the transfers. Further, with respect to fictitious profits, the Debtors received less than a reasonably equivalent value in exchange for such transfers. The Debtors were decidedly insolvent given the amount of the asserted Rabo debt, other claims of investors, and other debts, against the asset value of the Debtors.  The Debtors were further engaging in transactions at each juncture for which they had unreasonably small capital to satisfy (and were instead reliant upon further investor advances) and for which the Debtors knew they could not satisfy when matured, without additional investor funds.

88.    Accordingly, all of the Debtors's transfers to Investor Parties for any amounts in the "Total Payments Received" field of the above table, as well as detailed in the attached exhibits, violated 11 U.S.C. §548(a)(1)(A) and (a)(1)(B); Sections 24.005 and .0006 of the Texas Fraudulent Transfer Act; and Sections 378A.040 and .050 of the Kentucky Uniform Voidable Transactions Act.

89.     As discussed above, all transfers out of a Ponzi scheme are *prima facie* avoidable and it is not the Trustee's burden to plead and prove the defendants' affirmative defenses of value and good faith. The Trustee has nevertheless performed a significant inquiry into potential affirmative defenses. The Trustee believes that the Investor Parties named as fraudulent transfer defendants received returns that exceeded their investments on a net basis, and/or cannot arguably establish good faith as a result of their participation in the Debtors' Ponzi scheme, including because they held pre-signed checks of the Debtors, held and processed checks for other investors, and/or received investment returns so far outside the range of reasonableness that they cannot arguably establish themselves as innocent, arms-length investors.

90.     In addition to these amounts, Wildforest Cattle Co. and MAP Enterprises received the wrongful claw-backs described above.

91.     Pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 548(a)(l)(B), 550, and 551, Texas Business and Commerce Code §§ 24.005 and 24.006, and/or Kentucky Uniform Voidable Transactions Act §§ 378A.040 and .050, the Trustee is entitled to a judgment (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from the Investor Parties for any amounts in the "Total Payments Received" field of the above table, as well as detailed in the attached exhibits.  The Trustee is further entitled to a judgment awarding his attorney's fees. Tex. Bus. & Com. Code Ann. § 24.013.

## COUNT 6: DISALLOWANCE OF CLAIM,
## SUBORDINATION OF CLAIM

92.     For any of the foregoing investor defendants that have filed Proofs of Claim in the

Debtors' bankruptcy case, the parties have based such claims on alleged bounced checks, returned

wires, and/or amounts otherwise allegedly due under investment agreements.

93.     Under section 502(b)(1) of the Bankruptcy Code, the Court shall disallow a claim

to the extent, "such claim is unenforceable against the debtor and property of the debtor, under any

agreement or applicable law for a reason other than because such claim is contingent or

unmatured." In connection with a Ponzi scheme, a claimant is only entitled to a claim for their net

loss suffered by the scheme after netting all gains and losses from the scheme (and backing out

prior receipt of income or other profits). In the alternative, a claimant is only entitled to a claim for

the amount of their claim that represents principal amounts lost (and not interest or other profits).

The Trustee requests the Court to disallow the claims of the investor defendants except to the

extent that the investor defendants can prove the amounts that constitute their ultimate net losses

in the Debtors' Ponzi scheme, and in the alternative, for the principal amounts of such unpaid sum.

94.     Bankruptcy Code section 502(d) provides: "Notwithstanding subsections (a) and

(b) of this section, the court shall disallow any claim of any entity from which property is

recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer

avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such

entity or transferee has paid the amount, or turned over any such property, for which such entity

or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title." The Trustee requests

the Court to disallow all claims of the Proofs of Claim of any of the foregoing defendants to these

avoidance claims to the extent they received avoidable transfers described above until such time

as the defendant has paid the amount of the avoidable transfers.

95.     Pursuant to 11 U.S.C. §§ 510(c)(1) and 105(a), the Court should equitably subordinate any claimants whose conduct resulted in injury to creditors or the conferring of an unfair advantage. The Trustee reserves the right to seek to subordinate any of the claims of the defendants to this action to the extent they engaged in such inequitable conduct, such as holding blank checks of the Debtors or otherwise taking any role in the Ponzi scheme other than as an innocent arms-length investor.

## **RESERVATION OF RIGHTS**

96.     During this Adversary Proceeding, the Trustee may learn through discovery (or otherwise) additional facts and circumstances regarding the relationships among the Debtors, their affiliates, defendants herein, and other third parties that were unknown to the Trustee as of the date of this Complaint.

97.     The allegations in this Complaint are formed on the Trustee's ongoing investigation to date regarding the Debtors' transactions.

98.     The Trustee reserves all rights to supplement and amend this Complaint, including, without limitation, the right to: (a) further state, allege, or aver additional facts and information; (b) seek to avoid additional obligations, transfers, or conveyances; (c) seek to recover additional transfers; (d) modify, add, subtract, revise, or otherwise amend the parties; (e) allege additional defendant parties; or (f) allege additional causes of action that may become known to the Trustee at any time during this Adversary Proceeding through discovery or otherwise, and for all such amendments to this Complaint to relate back to the same.

## **PRAYER**

The Trustee respectfully requests the Court to award a judgment:

a.    Avoiding, preserving, and awarding a money judgment against the Family Member parties in the following amounts based upon their transfers from the Debtors: Crystal McClain - $1,720,000.00; Chelsea McClain - $960,000.00; Piper McClain - $2,347,500.00; and Kristin McClain - $2,347,500.00;

b.    Avoiding, preserving, and awarding a money judgment against each of the Investor Preference Defendants for the value of the total amount of payments from the Debtors and the reclaimed/retained cattle;

c.    Avoiding, preserving, and awarding a money judgment against each of the Vendor Preference Defendants for the subject payments from the Debtors;

i.    Avoiding, preserving, and awarding a money judgment against each of the Fraudulent Transfer Defendants for the value of the payments from the Debtors;

j.    Disallowing the Proofs of Claim of each of the defendants herein who is liable for an avoidable transfer and not remitted payment, and subordinating any claim to the extent of other inequitable conduct;

k.    Awarding prejudgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law against each of the defendants to this action, as well as attorney's fees;

l.    Awarding the Trustee his costs and expenses in this suit against each of the defendants to this action; and

m.    Awarding the Trustee such further relief, general or special, at law or in equity, to which the Trustee may be rightfully entitled.

Respectfully submitted,

*/s/ Hudson M. Jobe*
Hudson M. Jobe
Texas Bar No. 24041189
**JOBE LAW PLLC**
6060 North Central Expressway, Suite 500
Dallas, Texas 75206
(214) 807-0563
hjobe@jobelawpllc.com

**SPECIAL COUNSEL TO THE TRUSTEE**

Alan Dabdoub
State Bar No. 24056836
adabdoub@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:    214-981-3800
Facsimile:    214-981-3839

**SPECIAL COUNSEL TO THE TRUSTEE**