HUDSON M. JOBE
JOBE LAW PLLC
SPECIAL COUNSEL TO KENT RIES, CHAPTER 7 TRUSTEE

ALAN DABDOUB
STEVEN GERSTEN
FARSHEED FOZOUNI
CAMPBELL SODE
LYNN PINKER HURST & SCHWEGMANN LLP
SPECIAL COUNSEL FOR KENT RIES, CHAPTER 7 TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| McCLAIN FEED YARD, INC., | § | CASE NO. 23-20084-SWE |
| McCLAIN FARMS, INC., AND | § | JOINTLY ADMINISTERED |
| 7M CATTLE FEEDERS, INC., | § | |
| | § | Debtors. |
| KENT RIES, CHAPTER 7 TRUSTEE | § | |
| FOR THE BANKRUPTCY ESTATES | § | |
| OF McCLAIN FEED YARD, INC., | § | |
| McCLAIN FARMS, INC., AND | § | |
| 7M CATTLE FEEDERS, INC., | § | |
| | § | ADV. PROC. NO. 25-02003-SWE |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ANGELA ROBINSON, et al., | § | |
| | § | |
| Defendants. | § | |

**TRUSTEE'S CONSOLIDATED RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR PERMISSIVE ABSTENTION OR TO
WITHDRAW THE REFERENCE (DKT. NOS. 253, 255, 256, AND 257)**

**I. INTRODUCTION**

1.      Kent Ries, the Chapter 7 Trustee for the bankruptcy estates of McClain Feed

Yard, Inc., McClain Farms, Inc., and 7M Cattle Feeders, Inc. (the "Trustee"), respectfully

submits this Consolidated Response in Opposition to four related motions filed by twenty-seven

defendants, all represented by the same counsel. These motions (Dkt. Nos. 253, 255, 256, and

1

257) seek either permissive abstention under 28 U.S.C. § 1334(c)(1) or, alternatively, withdrawal of the reference under 28 U.S.C. § 157(d) and Federal Rule of Bankruptcy Procedure 5011.

2.      These motions represent the latest chapter in a sustained pattern of procedural obstruction by these defendants. Many of these same parties resisted the Trustee's Rule 2004 discovery efforts, filing objections that were overruled after a contested evidentiary hearing. See Case No. 23-20084, Dkt. Nos. 188-189, 223. After the Court ordered production, the vast majority of these defendants produced nothing—in open defiance of Court orders. See Declaration of Frederick "Rick" F. Cass ("Cass Decl."), TR 000014-016 at ¶¶ 6-7. When the Trustee filed suit to recover hundreds of millions of dollars fraudulently transferred through the Debtors' Ponzi scheme, these same defendants moved to dismiss on technical service grounds. See Adv. Proc. No. 25-02003, Dkt. Nos. 70-73, 127-128. The Court denied those motions. These defendants now seek to fragment a consolidated proceeding involving over 100 defendants into separate lawsuits across multiple jurisdictions.

3.      The Court should reject this strategy. The fourteen factors governing permissive abstention overwhelmingly favor retaining this proceeding. Most of the movants who filed proofs of claim and USDA Dealer Trust claims have waived any right to a jury trial and consented to this Court's jurisdiction under *Langenkamp v. Culp*, 498 U.S. 42 (1990), and *Katchen v. Landy*, 382 U.S. 323 (1966). For the remaining movants who did not file claims, any right to a jury trial does not require abstention or immediate withdrawal—it can be preserved by retaining pre-trial matters in this Court and recommending withdrawal only when the case is trial-ready, as contemplated by Local Rule 5011-1(a)(8)(B)-(C). *See also Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com*), 504 F.3d 775, 787 (9th Cir. 2007) ("[A] Seventh Amendment jury trial right does not mean the bankruptcy court must stop working on a matter.").

2

4.      Perhaps most critically, granting these motions would invite identical filings from the remaining 100+ defendants in this adversary proceeding. The movants have admitted that if withdrawal is granted, they intend to file motions to transfer venue to their home states in Kentucky, Kansas, and Michigan. That is the very definition of forum shopping and thwarting the goal of the efficient resolution of issues involving a bankruptcy debtor in one forum, and granting these motions would result in the complete fragmentation of a case that should be administered on a consolidated basis—with the Trustee forced to conduct duplicative discovery across dozens of forums, notice depositions hundreds of times instead of once, and litigate overlapping factual and legal issues in multiple different proceedings—all at enormous cost to the estate and to the other creditors of the Debtors and at risk of inconsistent results.

## II. GENERAL BACKGROUND

### A. The Debtors and the Bankruptcy Filing

5.      On April 28, 2023, McClain Feed Yard, Inc. ("MFY"), McClain Farms, Inc. ("MFI"), and 7M Cattle Feeders, Inc. ("7M") (collectively, the "Debtors") each filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code. See Case No. 23-20084 (MFY); Case No. 23-20085 (MFI); Case No. 23-20086 (7M). All three cases are jointly administered under Case No. 23-20084. The filings were initiated by Glenn Karlburg, Chief Restructuring Officer, who had been retained only three weeks earlier on April 7, 2023, at the insistence of Rabo AgriFinance LLC ("RAF"), the Debtors' primary secured lender. Ries Decl., TR 000001, ¶ 4. Shortly after Mr. Karlburg's retention, Brian McClain—the principal of all three entities—committed suicide on April 18, 2023. Id.

6.      Brian McClain was well-known in the cattle and rodeo industries. Through his three entities, he attracted hundreds of passive investors through purported "partnership agreements" under which investors would fund cattle purchases. McClain was supposed to

acquire, grow, and sell cattle with investor funds, and profits would be split approximately two-thirds to the investor and one-third to McClain. In reality, the cattle backing these agreements largely did not exist, the promised profits were fictitious, and the Debtors were repaying earlier investors using funds from new investors in the classic structure of a Ponzi scheme. Adv. Proc. No. 25-02003, Dkt. No. 9, ¶¶ 25-35.

7.     The collapse of the scheme was sudden and devastating. Before the bankruptcy filing, Mr. Karlburg had purportedly authorized the transfer of all of the Debtors' physical and electronic records to an outside financial consultant (Focus Management Group) working with RAF in Chicago. Ries Decl., TR 000001-002, ¶ 4. Mr. Karlburg was based out of Arizona, and there were no other known day-to-day former employees of the Debtors with knowledge of the daily business operations and record keeping, other than Mr. McClain, then deceased, and his daughters. *Id.* As a result, the Trustee began his administration with virtually no access to usable Debtor records and no cooperating insiders. Id. The estate professionals were able to obtain the Debtors' records from Focus during the summer of 2023, but those records "were ultimately shown to be in generally poor condition, incomplete, unreliable, and insufficient to allow [the Trustee and his] professionals . . . to understand in detail the Debtors' pre-bankruptcy transactions and business dealings." Ries Decl., TR 000002, ¶ 5.

### B. The USDA Claims

8.     Following the Debtors' bankruptcy filings, approximately 100 parties filed a total of 386 individual claims with the United States Department of Agriculture's Packers and Stockyards Division under the Dealer Trust Statute, 7 U.S.C. § 217b, asserting aggregate claims of $122,295,867.46 against McClain Farms, Inc. The claimants asserted that proceeds held in the bankruptcy estate should be distributed to them as unpaid cash sellers of livestock entitled to priority under the statutory trust.

4

9.      After investigation, the USDA determined that the overwhelming majority of these claims were not based on qualifying cash sales of livestock. Rather, they arose from cattle feeding arrangements and investment agreements that fall outside the Dealer Trust Statute's protections. The USDA determined that only a small handful of claims were "apparently valid" under the statute ($2,687,968.77). Ries Decl., TR 000002, ¶ 6; Ries Decl., Exh. A (TR 000003-013). The remaining $119,338,263.86 in claims were deemed apparently non-valid. *Id.*

10.      Significantly, many of the movants before this Court filed USDA claims that were found to be non-valid. As detailed below, the Group 2 movants in Dkt. Nos. 256 and 257 collectively filed USDA claims totaling approximately $20.3 million—every one of which was determined to be apparently non-valid by the USDA. See Exhibit C (Party Reference Chart). These same parties now claim they have no connection to the bankruptcy process sufficient to warrant this Court's jurisdiction, even as they have actively sought to claim estate assets through the USDA process.

### C. The Proofs of Claim

11.      A total of 262 proofs of claim have been filed across all three jointly administered cases by approximately 102 distinct claimants. The aggregate liquidated claims are staggering: $161,430,141.38 in the MFY case, $176,769,147.03 in the MFI case, and $159,619,165.81 in the 7M case—reflecting that the majority of claimants filed identical or substantially similar claims in all three cases. The single largest creditor is Rabo AgriFinance LLC, which filed claims of $53,516,988.13 in each of the three cases. Among the investor claimants, the largest claims were filed by 2B Farm, Thorlakson Diamond T Feeders LP, MAP Enterprises Inc., Jared Lesh, and Don Jones Farm Inc.

12.      Of critical importance to these motions, many of the Group 2 movants filed proofs of claim in one or more of the bankruptcy cases. Don Jones Farm Inc. alone filed claims totaling

$21,207,417.42, making it one of the five largest claimants in the entire bankruptcy. Curtis Jones Farms filed claims totaling $5,716,773.42. Wildforest Cattle Co. filed USDA and Proofs of Claim exceeding $10.7 million. The filing of these proofs of claim has direct and dispositive consequences for these movants' arguments, as discussed in Section IV below. See Exhibit C (Party Reference Chart).

### D. The Trustee's Prior Discovery Efforts and Limited Success

13.    In the fall of 2023, the Trustee commenced significant Rule 2004 discovery from over 100 parties who had filed USDA claims and proofs of claim, including many of the current movants. Case No. 23-20084, Dkt. No. 195. The claimants heavily resisted. Multiple parties filed objections arguing the requests were "overly broad in scope, unlimited in time, and unduly burdensome." Case No. 23-20084, Dkt. Nos. 185-190. Among the objectors were Curtis Jones Farms and Kinsey Jones (Dkt. Nos. 188-189)—parties whose counsel now represents all twenty-seven movants before this Court.

14.    Following a contested evidentiary hearing on March 18, 2024, Judge Jones issued a comprehensive written opinion on April 19, 2024, finding that "[t]he Trustee's testimony . . . revealed that the Debtors' record keeping, or lack thereof, creates a need for documents to establish the financial history of the Debtors and to identify invoices and contracts related to transfers to and from the Debtors." Case No. 23-20084, Dkt. No. 223. The Court overruled the parties' objections and granted the Trustee's motion. Id. Formal orders were entered on April 26, 2024: Dkt. 233 (ordering production from certain non-USDA claimants), and Dkt. 234 (ordering production from USDA claimants, specifically naming TGF Ranch, Rick Rodgers, Mykel Tidwell, John Tidwell, Wildforest Cattle Co., Eric DeJarnett, Brent Burnett, Joe Burnett, Dwight Jesko, Cory Jesko, Curtis Jones Farms, Kinsey Jones, Don Jones Trucking, and Don Jones Farm, and numerous others). Case No. 23-20084, Dkt. Nos. 233, 234.

15.     The Trustee and his accountants at Lain Faulkner & Co. then undertook extensive efforts to implement the Court's orders. They created a public website with the discovery orders available for viewing, created separate upload links for each claimant to submit documents, and sent hundreds of separate emails and certified letters to claimants and their counsel. Cass Decl., TR 000014-015, ¶¶ 3-5; Exh. A-I.

16.     Despite the Court's clear orders and the Trustee's extensive multi-wave notification efforts, the majority of the parties have refused to provide all responsive documents. Of the parties subject to the discovery orders, only twelve appeared to have produced all responsive documents. Thirty-six parties produced zero documents or only claim backup materials. The remaining sixty-seven parties produced some documents but likely failed to produce all responsive materials. Cass Decl., TR 000015, ¶ 6; Cass Decl., Exh. K (TR 000030-33). As detailed in Section III below, the movants before this Court were among the worst offenders.

17.     The defendants' massive non-compliance forced the Trustee to independently obtain banking records from the Debtors' depository banks—Mechanics Bank and Community Financial Services Bank—and conduct an extraordinary analysis. The banking data was beyond voluminous: for an approximate four-year period, it included at least 2,108 different payors and payees, 28,107 debit entries, 10,805 credit entries, and $4,365,825,711.28 in dollar volume activity. Cass Decl., TR 000015, ¶ 8; Cass Decl., Exh. L (TR 000060-066). This reconstruction was made significantly more expensive and time-consuming due to the defendants' refusal to produce their own records voluntarily—records that, in many cases, would have consisted of nothing more than bank statements and communications that any party could produce with minimal effort.

7

**E. The Rabo Lawsuit (Adv. Proc. 23-02005)**

18.   Concurrent with the Trustee's efforts, RAF filed Adversary Proceeding 23-02005 against more than 100 "Dealer Trust Claimants." RAF seeks declaratory relief on three grounds: (1) that its security interests predate the Dealer Trust Statute's December 27, 2020 effective date, meaning the statute cannot be applied retroactively to strip RAF's first-priority perfected liens on estate funds; (2) that even if the statute applies, only the seven "apparently valid" claimants could potentially recover, and only from a limited subset of funds; and (3) that no trust under the Dealer Trust Statute could have arisen before March 16, 2023, insulating all prior loan payments to RAF. Case No. 23-02005, Dkt. No. 3.

19.   This proceeding is directly relevant to the instant motions because it involves many of the same parties. Every single Group 2 movant who filed a USDA claim is named as a defendant in the Rabo Lawsuit as a "Non-Valid Claimant." See Exhibit C. Thomas Frith (as Tom Frith) and TGF Ranch (as TGF Ranch LLC) from Group 1 are also named. The overlapping parties and factual issues between the Rabo Lawsuit, this Investor Lawsuit, and the Bank Lawsuit create a compelling need for coordinated administration before this Court.

**F. The Investor Lawsuit (This Adversary Proceeding — Adv. Proc. 25-02003)**

20.   The Trustee filed his Original Complaint on March 2, 2025, against over 100 defendants. Adv. Proc. No. 25-02003, Dkt. No. 1. A First Amended Complaint was filed on April 25, 2025, adding additional defendants. Dkt. No. 9. The Trustee asserts preference claims under 11 U.S.C. § 547—pure federal bankruptcy claims—and fraudulent transfer claims under both 11 U.S.C. § 548 and the state Uniform Fraudulent Transfer Act.

21.   The Trustee also invokes the Ponzi scheme presumption, under which all transfers out of a Ponzi scheme are presumptively fraudulent as a matter of law, shifting the burden to each defendant to prove both objective good faith and reasonably equivalent value. *See Janvey v.*

8

*Democratic Senatorial Campaign Comm., Inc.,* 712 F.3d 185, 196 (5th Cir. 2013) ("a Ponzi scheme is, as a matter of law, insolvent from its inception"). The total payments at issue across all defendants run into the hundreds of millions of dollars—including MAP Enterprises ($232 million total received), 2B Farms ($264 million total received), and Lazy J Arena ($229 million total received). Dkt. No. 9, ¶¶ 90-94. The Trustee also seeks disallowance and subordination of proofs of claim by defendant investors. Dkt. No. 9, ¶¶ 95-100.

### G. The Bank Lawsuit (Adv. Proc. 25-02005 — Ries v. CFSB et al.)

22.    The Trustee has also filed Adversary Proceeding 25-02005 against HTLF Bank, Mechanics Bank, Rabo AgriFinance LLC, and Community Financial Services Bank. These claims arise from the banks' roles as depository institutions and secured lenders during the years in which the Ponzi scheme operated. The Trustee alleges that the banks knew or should have known of the fraudulent nature of the Debtors' operations and facilitated the scheme by continuing to extend credit and process transactions.

23.    This lawsuit shares substantial factual overlap with the instant investor lawsuit. Both proceedings concern the same underlying transactions, the same banking records obtained from Mechanics Bank and CFSB, and the same analysis. The existence of three related adversary proceedings before this Court—the Rabo Lawsuit, this Investor Lawsuit, and the Bank Lawsuit—each involving overlapping parties, facts, and legal theories, provides a compelling justification for retaining jurisdiction and denying any request to fragment these proceedings.

### III. THE MOVANTS' SPECIFIC HISTORY
#### A.  Who Are the Movants

24.     The twenty-seven defendants are divided into two groups. All are represented by the same counsel. Dkt. Nos. 253 and 255 were filed by the "No POC Group" or "Group 1": Keith Harris Farms Inc., Tyler Pittman, Pittman Farms, Keith Myers, J&S Investments, Caleb Little, Sam Brown, Don Jones (individually), Curtis Jones (individually), Jones Family Cattle LLC, Thomas Frith, and TGF Ranch—twelve parties. None filed proofs of claim. Only TGF Ranch filed a USDA claim ($1,159,266.05, found non-valid). See Exhibit C.

25.     Dkt. Nos. 256 and 257 were filed by the "POC Group" or "Group 2": Don Jones Trucking Inc., Don Jones Farm Inc., Curtis Jones Farms, Kinsey Jones, Rick Rodgers, Mykel Tidwell, John Tidwell, Wildforest Cattle Co. LLC, Eric DeJarnett, Brent Burnett, Joe Burnett, Dwight Jesko, Patricia Jesko, Cory Jesko, and Jeff Jesko—fifteen parties. The vast majority filed proofs of claim and USDA claims. Critically, they themselves acknowledge in their motion that they have waived their right to a jury trial. See Dkt. No. 256, p. 6.

26.     Notably, Don Jones and Curtis Jones appear as individuals in Group 1 while their corporate entities—Don Jones Trucking Inc., Don Jones Farm Inc., and Curtis Jones Farms— appear in Group 2. The same individuals thus seek the protections of both postures through the same counsel: arguing through their individual names that they never participated in the bankruptcy process, while their corporate entities (through which the actual transactions occurred) filed proofs of claim totaling tens of millions of dollars.

**B. The Movants' Discovery Non-Compliance**

27.     The discovery history of these movants reveals systematic obstruction. As detailed in the Cass Declaration, the following current movants were specifically named in the Court's discovery orders and produced zero documents in response: Brent Burnett, Joe Burnett, John Tidwell, Mykel Tidwell, Eric DeJarnett, TGF Ranch, Rick Rodgers, and Dwight Jesko. Cass Decl., TR 000015, ¶ 7. Curtis Jones Farms, Don Jones Trucking, Don Jones Farm, and

Kinsey Jones were named in both Dkt. 233 and Dkt. 234 and not only produced nothing but had previously filed formal objections to the discovery they were later ordered to provide. Case No. 23-20084, Dkt. Nos. 188-189; Cass Decl., TR 000015, ¶ 7.

28.     Keith Harris Farms provided only certain banking records but withheld bank statements confirming payors and payees and all communications. Cass Decl., TR 000015, ¶ 7. Thomas Frith was not expressly named in the discovery order, but his entity TGF Ranch was— and neither produced a single document. Id. at n.2. Patricia Jesko was not individually named, but her husband Dwight was; neither produced any records. Id. at n.3.

29.     This is not inadvertent non-compliance. These defendants received the Court's orders through multiple channels—direct email, follow-up emails, certified mail, and a public website. They are all represented by the same counsel.  They have not moved to excuse compliance with the prior order, nor worked to produce materials to be in compliance, while at the same time filing various motions seeking to escape this Court's jurisdiction. This knowing refusal to comply has led to increase cost for the estate in reconstructing the $4.37 billion in banking data described above—at enormous expense. The same defendants who refused to produce a single document now ask this Court to believe they are entitled to litigate in a different forum of their choosing.

### C. Proofs of Claim and USDA Claims Filed by the Movants

30.     The attached Party Reference Chart (Exhibit C) summarizes each movant's claims filing history. The key facts are as follows:

31.     Group 2 movants filed USDA claims totaling approximately $20.3 million—all found non-valid. Don Jones Farm alone filed USDA claims of $7,673,566.08, Wildforest Cattle Co. $5,382,859.66, Curtis Jones Farms $2,208,532.93, Rick Rodgers $1,816,097.61, and Don Jones Trucking $1,250,833.14. See Exhibit C.

32. Group 2 movants filed proofs of claim across the three cases totaling approximately $47.7 million. Don Jones Farm claimed $21,207,417.42 across all three cases, Wildforest Cattle Co. over $10.7 million, Curtis Jones Farms $5,716,773.42, and Don Jones Trucking $3,752,499.42. See Exhibit C.

33. Every Group 2 movant who filed a USDA claim is also named as a defendant in the Rabo Lawsuit (Adv. Proc. 23-02005) as a "Non-Valid Claimant." These defendants are parties to multiple proceedings before this Court, further undermining their claim that this forum is inappropriate. See Exhibit C.

**D. The Movants' Prior Failed Attempts to Dismiss This Case**

34. Before filing the instant motions, these same defendants attempted to have this adversary proceeding dismissed on technical service grounds:

35. • Keith Harris Farms Inc. (Dkt. No. 70);

36. • Tyler Pittman, Pittman Farms, Keith Myers, Caleb Little, and J&S Investments (Dkt. No. 71);

37. • Thomas Frith and TGF Ranch LLC (Dkt. No. 73);

38. • Curtis Jones, Curtis Jones Farms, Don Jones, Don Jones Farm Inc., Don Jones Trucking Inc., Kinsey Jones, and Jones Family Cattle LLC (Dkt. No. 127); and

39. • Wildforest Cattle Co. LLC and Sam Brown (Dkt. No. 128).

40. The Trustee responded (Dkt. Nos. 135, 143), demonstrating the delay was brief, inadvertent, and did not substantially harm the defendants. The Court denied the motions to dismiss.

41. The pattern is unmistakable: (1) objected to discovery—overruled; (2) defied Court-ordered discovery production; (3) moved to dismiss on technical service grounds—denied;

12

(4) now seek to fragment the proceeding through abstention or withdrawal. Each successive motion serves the same purpose: delay, obstruction, and avoidance of accountability.

## IV. ARGUMENT

### A. The Fourteen-Factor Test Overwhelmingly Favors Retention

42.    Courts in this district apply a fourteen-factor test for permissive abstention under 28 U.S.C. § 1334(c)(1). *See In re Republic Reader's Service, Inc.*, 81 B.R. 422, 426 (Bankr. S.D. Tex. 1987); *McVey v. Johnson*, 519 B.R. 172, 190 (Bankr. S.D. Tex. 2014); *In re Viper Products & Servs., LLC*, 2022 WL 2707879, at *2 (Bankr. N.D. Tex. July 11, 2022). "No single factor is dispositive." *Viper*, 2022 WL 2707879, at *2. Applied to this case, the factors overwhelmingly favor retention.

43.    (1) Effect on estate administration. This factor strongly favors retention. This adversary proceeding is not tangential to the bankruptcy—it IS one of the primary mechanisms for estate recovery. The Trustee seeks to recover hundreds of millions of dollars from over 100 defendants in a Ponzi scheme. Movants cite *In re Viper Products*, but that case involved a simple two-party contractual dispute in a straightforward liquidation with minimal recovery potential. The Viper court found "minimal, if any, effect on the administration of the estate." 2022 WL 2707879, at *4. Here, the effect is maximal—these avoidance actions ARE the estate administration.

44.    (2) State law predominance. This factor favors retention. The Trustee's preference claims under 11 U.S.C. § 547 are pure federal bankruptcy claims that have no state-law analog and exist solely within the federal bankruptcy system. The fraudulent transfer claims invoke both § 548 and UFTA, with the Ponzi scheme presumption—a bankruptcy-specific doctrine—at their core. The disallowance and subordination claims under §§ 502 and 510 are exclusively federal

13

bankruptcy matters. This is not a contract dispute dressed in bankruptcy clothing. These claims are also related to the asserted USDA Trust Claims – a federal statute.

45.     (3) Difficult or unsettled law. This factor is neutral or favors retention. The Ponzi scheme presumption's application to cattle feeding arrangements, insider status of passive investors, the interplay between USDA Dealer Trust claims and bankruptcy avoidance actions, and net loss calculations in a multi-entity scheme present complex legal questions uniquely suited to a bankruptcy court's expertise.

46.     (4) Related proceedings. This factor strongly favors retention. Three related adversary proceedings are pending before this Court: the Rabo Lawsuit (Adv. Proc. 23-02005), this Investor Lawsuit (Adv. Proc. 25-02003), and the Bank Lawsuit (Adv. Proc. 25-02005). All involve overlapping parties and facts. The primary basis underlying many of the claims is essentially the same detailed, and complex, Ponzi scheme operation of the Debtors. Many movants are defendants in both this proceeding and the Rabo Lawsuit. Abstaining would create serious risk of inconsistent rulings in that lawsuit, as well as inconsistent rulings between the various defendants to this lawsuit if they were all tried in different forums.

47.     (5) Jurisdictional basis other than § 1334. This factor is neutral. The absence of independent diversity or federal-question jurisdiction is unremarkable—it is the normal posture of bankruptcy adversary proceedings that Congress specifically vested in the bankruptcy courts. Treating this factor as favoring abstention would effectively read § 1334 out of the statute.

48.     (6) Relatedness to the main case. This factor strongly favors retention. Avoidance actions are specifically identified as core proceedings under 28 U.S.C. § 157(b)(2)(F) and (H). Every dollar recovered flows directly into the estate for distribution. Claim disallowance and subordination are inseparable from the claims allowance process—the exclusive province of the bankruptcy court.

14

49.     (7) Substance rather than form. This factor favors retention. Preference claims under § 547 are substantively core—they exist only because of the Bankruptcy Code and have no state-law analog. State courts have no preference law and no comparable mechanism for avoiding transfers based on timing relative to insolvency. Fraudulent transfer claims brought by a trustee to augment the estate in a Ponzi scheme are likewise substantively core. The fact that some claims incorporate state-law standards does not transform them into non-core matters when they arise directly from and serve the bankruptcy estate.

50.     (8) Feasibility of severing. This factor strongly disfavors abstention. Severing claims against twenty-seven defendants from a 100+ defendant proceeding sharing overlapping facts would create parallel proceedings on overlapping, and in many instances, identical evidence. The Ponzi scheme operated as a unified fraud—funds flowed through the same bank accounts, the same entities, and the same mechanisms. Severing would invite the remaining 100+ defendants to file identical motions, resulting in complete fragmentation.

51.     (9) Burden on the court's docket. This factor favors retention, contrary to movants' argument. Abstaining would not eliminate the burden—it would multiply it by creating parallel proceedings. The bankruptcy court is the most efficient forum because it can coordinate discovery across all 100+ defendants and leverage its existing familiarity with the parties and related proceedings.

52.     (10) Forum shopping. This factor favors retention. Movants concede the Trustee did not forum shop. But the movants' own motions reveal their forum-shopping strategy: footnote 2 of Dkt. 253 expressly states that if withdrawal is granted, they intend to file motions to transfer venue to their home states. That is textbook forum shopping.

53.     (11) Jury trial. This factor is split and, taken as a whole, favors retention. The Group 2 movants themselves concede they waived their jury trial rights by filing proofs of claim.

15

Dkt. No. 256, p. 6. Under *Langenkamp v. Culp*, 498 U.S. 42 (1990), this concession is legally correct. As to Group 1 movants, the Trustee acknowledges that under *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), they may retain Seventh Amendment rights. But "a Seventh Amendment jury trial right does not mean the bankruptcy court must stop working on a matter." *In re Healthcentral.com*, 504 F.3d at 787. The proper approach is retention of pretrial matters with withdrawal only when trial-ready.

54.     (12) Non-debtor parties. This factor is neutral. Non-debtor defendants are the normal and expected posture of avoidance actions. Treating this as favoring abstention would mean every trustee avoidance action should be abstained from—plainly contrary to congressional intent.

55.     (13) Comity. This factor favors retention. No state court proceeding exists. There is no state court to extend comity to.

56.     (14) Prejudice. This factor strongly favors retention. Abstaining would severely prejudice the estate by: (a) fragmenting discovery across multiple forums; (b) requiring depositions to be noticed dozens of times instead of once; (c) delaying resolution; (d) dramatically increasing administrative costs; and (e) inviting identical motions from the remaining 122 defendants. The prejudice from abstention vastly outweighs any conceivable prejudice from retention.

57.     B. Group 2 Movants Who Filed Proofs of Claim and USDA Claims Have No Basis for Abstention or Withdrawal

58.     The motion filed by the Group 2 movants (Dkt. Nos. 256, 257) fails for an independent and dispositive reason: these defendants consented to this Court's jurisdiction by filing proofs of claim.

16

59.     Under *Langenkamp v. Culp*, 498 U.S. 42 (1990) (per curiam), "[b]y filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power." Id. at 44-45. Creditors who file claims "have no right to a jury trial" on the trustee's preference action. Id. at 45. *See also Katchen v. Landy*, 382 U.S. 323, 336 (1966) ("[A] bankruptcy court has summary jurisdiction to order the return of a voidable preference where the party from whom recovery is sought has filed a claim against the bankrupt's estate."); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015) (parties may consent to bankruptcy court jurisdiction, and such consent may be implied from conduct).

60.     The Group 2 movants acknowledge this in their own motion: "because these Movants have filed proofs of claim, they have waived their right to a jury trial so this factor is neutral." Dkt. No. 256, p. 6. Having filed proofs of claim totaling approximately $47.7 million—and having thereby submitted themselves to the claims allowance process—these defendants cannot argue this Court lacks authority to adjudicate the Trustee's avoidance actions against them.

61.     Remarkably, the Group 2 movants further undermine their own position through their offset theory. They argue that their proof-of-claim assertions should reduce any avoidance recoveries—for example, Rick Rodgers argues his $1,816,097.61 proof of claim offsets the $1,455,151 preference sought by the Trustee. See Dkt. No. 256. But this offset argument proves the avoidance actions and claims allowance process are inextricably intertwined. If the defendants' claims should offset the estate's claims, then both must be resolved in the same court with authority over both—which is this Court. The defendants cannot argue for setoff while simultaneously demanding the related proceedings be severed and heard elsewhere.

17

62.     Moreover, many Group 2 movants filed USDA claims totaling approximately $20.3 million, asserting rights to estate funds held in statutory trust. The act of filing USDA claims asserting rights to estate assets further demonstrates voluntary participation in the bankruptcy process. These defendants cannot simultaneously claim entitlement to estate assets while arguing the Court administering those assets lacks authority over them.

63.     Because the Group 2 movants have waived their jury trial rights and consented to this Court's jurisdiction, their primary arguments—the constitutional authority concerns under *Stern v. Marshall*, 564 U.S. 462 (2011), and the Seventh Amendment jury trial arguments—are entirely inapplicable. The motion should be denied as to them in its entirety.

### C. Even for Non-POC Movants, Withdrawal Is Premature

64.     The Trustee acknowledges that Group 1 movants who did not file proofs of claim may ultimately be entitled to a jury trial. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). However, the existence of a potential jury trial right does not require abstention or immediate withdrawal. It requires only that the right be preserved until the case is ready for trial.

65.     The Ninth Circuit squarely addressed this issue in *In re Healthcentral.com*, 504 F.3d 775 (9th Cir. 2007), holding that "a Seventh Amendment jury trial right does not mean the bankruptcy court must stop working on a matter." *Id.* at 787. The proper approach is to allow bankruptcy courts to handle pretrial matters while preserving jury trial rights through subsequent withdrawal when trial becomes necessary. Many cases settle or are resolved through pretrial motions, making premature withdrawal wasteful. Id. at 786-87.

66.     The Fifth Circuit's factors for evaluating withdrawal under *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985) all favor retention at this stage: (1) efficient use of judicial resources—the bankruptcy court has specialized expertise and existing familiarity with this Ponzi scheme; (2) delay and costs—withdrawal would cause

18

significant delay and impose enormous costs as a new court learns the case; (3) uniformity of bankruptcy administration—consistent application of preference and fraudulent transfer law across 149 defendants requires a single forum; and (4) prevention of forum shopping—the defendants have admitted they would seek venue transfers to home states.

67. Local Rule 5011-1(a)(8) expressly contemplates this approach: subsection (B) provides for withdrawal "upon certification by the bankruptcy judge that the parties are ready for trial," and subsection (C) provides for withdrawal "but that pre-trial matters be referred to the bankruptcy judge." Either option preserves rights while avoiding waste.

68. This case is nowhere near trial. No scheduling order has been entered. Adversary discovery has not begun. There are 100+ defendants, many of whom have not yet answered. Withdrawing the reference now would accomplish nothing except to transfer an early-stage, multi-party case from the court best equipped to manage it to a district court that would face identical challenges.

### D. Stern v. Marshall Is Inapplicable

69. The movants' reliance on *Stern v. Marshall*, 564 U.S. 462 (2011), is misplaced. Stern addressed a state-law tortious interference counterclaim brought by a debtor—not trustee avoidance actions created by the Bankruptcy Code. The Supreme Court in Stern specifically distinguished its narrow holding from traditional avoidance actions, noting that bankruptcy courts retain authority over matters that "stem from the bankruptcy itself." 564 U.S. at 499.

70. For Group 2 defendants, Stern is entirely moot—they consented to this Court's jurisdiction through their proofs of claim. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). Even for Group 1 defendants, any arguable Stern concern is addressed through § 157(c)(1)'s mechanism for proposed findings and conclusions—not through abstention.

19

### E. Granting These Motions Would Open the Floodgates

### and Devastate Estate Administration

71.     There are 100+ defendants in this adversary proceeding. If the Court grants abstention or withdrawal for these twenty-seven, that invites other defendants to file identical motions. The result: complete fragmentation of a case that must be handled on a consolidated basis.

72.     The Trustee would face 100+ separate lawsuits across multiple states. Instead of noticing a deposition once, the Trustee would notice it dozens of times. Instead of filing one set of summary judgment briefing on the Ponzi scheme presumption and insider status, the briefing would be repeated in dozens of courts. The estate would retain local counsel in dozens of jurisdictions, multiplying legal fees. The cost to the estate would be devastating—directly harming the creditors who are themselves victims of this fraud.

73.     The movants' strategy is transparent. By filing four coordinated motions through the same counsel, seeking to peel off twenty-seven defendants at a time, they aim to dismember the Trustee's consolidated action. Their footnote 2 admission—that they intend to seek venue transfers to home states—reveals this is forum shopping, not a good-faith jurisdictional concern. The Court should recognize this strategy and deny the motions to protect the integrity of these consolidated proceedings.

### V. CONCLUSION AND PRAYER FOR RELIEF

74.     The fourteen-factor abstention test overwhelmingly favors retention. The Group 2 movants who filed proofs of claim and USDA claims have waived their jury trial rights, consented to this Court's jurisdiction, and have no legal basis for abstention or withdrawal. Even for Group 1 movants, withdrawal is premature and the proper approach is to retain pretrial matters with withdrawal only upon trial-ready certification.

20

75.     Granting these motions would invite identical filings from the remaining 122 defendants, resulting in complete case fragmentation. The movants' pattern of obstruction—resisting discovery, defying Court orders, seeking dismissal on technical grounds, and now seeking abstention—reflects a litigation strategy designed to delay, increase costs, and avoid accountability. The Court should not reward this strategy.

WHEREFORE, the Trustee respectfully requests that the Court:

76.     Deny the Motions for Permissive Abstention (Dkt. Nos. 253 and 256) in their entirety;

77.     Deny the Motions for Withdrawal of the Reference (Dkt. Nos. 255 and 257) in their entirety;

78.     In the alternative, if the Court is inclined to grant withdrawal as to any defendants, retain all pre-trial matters in this Court and recommend withdrawal only upon certification that the case is ready for trial, as contemplated by Local Rule 5011-1(a)(8)(B)-(C); and

79.     Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**JOBE LAW PLLC**

*/s/ Hudson M. Jobe*
Hudson M. Jobe
Texas Bar No. 24041189
6060 North Central Expressway, Suite 500
Dallas, Texas 75206
Telephone: 214.514.5656
Email: hjobe@jobelawpllc.com

*/s/ Alan Dabdoub*
Alan Dabdoub
State Bar No. 24056836
adabdoub@lynnllp.com
Campbell Sode
State Bar No. 24134507
csode@lynnllp.com
Farsheed Fozouni

21

State Bar No. 24097705
ffozouni@lynnllp.com
Steven Gersten
State Bar No. 24087579
sgersten@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:     214-981-3800
Facsimile:     214-981-3839
**SPECIAL COUNSEL TO THE TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2026, a true and correct copy of the foregoing was served on all parties of record via the Court's CM/ECF electronic filing system.


*/s/ Hudson M. Jobe*
Hudson M. Jobe

22